[No. S004709. Crim. No. 25383. Dec. 27, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN WAYNE ANDERSON, Defendant and Appellant.

COUNSEL

William M. Goodman, under appointment by the Supreme Court, David R. Callaway and Topel & Goodman for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart and Steve White, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Jay M. Bloom and Gil P. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—Defendant Stephen Wayne Anderson appeals from a judgment imposing the death penalty following his conviction of first degree murder and burglary, accompanied by a felony-murder special circumstance. In *People v. Anderson* (1985) 38 Cal.3d 58 [210 Cal.Rptr. 777, 694 P.2d 1149] (*Anderson I*), we reversed defendant's original judgment as to penalty and set aside the special circumstance finding because of the court's failure to instruct on intent to kill as an element of the felony-murder special circumstance. (See *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], overruled by *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306].)

We affirmed the judgment in all other respects. On retrial, the jury again found the special circumstance allegation true and returned a death verdict. Thereafter, the trial court denied defendant's motion to modify the sentence (Pen. Code, § 190.4, subd. (e); all further statutory references are to this code unless otherwise indicated). Defendant's appeal is automatic. (§ 1239, subd. (b).)

## I. FACTS

### A. *Special Circumstance Phase*

The evidence on retrial of the special circumstance allegation largely paralleled the evidence introduced at defendant's first trial and summarized

in *Anderson I.* Defendant confessed to the burglary/murder of an elderly woman, Mrs. Lyman. Defendant had scrutinized the premises for several days, awaiting indications that the occupants were on vacation. He arrived at the house shortly before midnight on May 25, 1980, cut through a screen door and removed a pane of glass from a second door to gain entry. Armed with a handgun, he entered the bedroom where Mrs. Lyman was sleeping. She awoke and began to scream. Defendant turned toward her and fired his weapon, killing her. As defendant admitted, "I sleep with my gun. Somebody come at me and I—I'm going to blow them away. You know, that's the first thing I thought of, you know."

Defendant ransacked the house, finding approximately $112. He turned on the television set and was eating some noodles when sheriff's deputies, alerted by neighbors, arrived and arrested him.

Defendant did not testify with respect to the special circumstance issue. He called a psychiatrist, Dr. Thompson, who testified that he had a brain abnormality which, when affected by alcohol, diminished his capacity to form a specific intent. A psychologist, Dr. Beaber, testified that one's survival instincts, coupled with a perception of danger, might arouse action without thought. On rebuttal, a neurologist, Dr. Hunt, and a psychiatrist, Dr. Oshrin, disputed the theory that defendant had a brain abnormality or reacted unthinkingly or impulsively to Mrs. Lyman's presence.

### B. *Penalty Phase*

The People introduced evidence of defendant's prior convictions for aggravated burglary and aggravated assault of a prisoner, as well as evidence of two unadjudicated murders involving victims Blundell and Glashien.

The defense called a prison chaplain, Eshelman, who opined that defendant's many occupations (e.g., plumber, electrician, cook and carpenter) would be useful to the prison. Defendant testified on his own behalf. Among other things, he denied any intent to kill Mrs. Lyman, disputed killing Glashien, claimed he killed Blundell in self-defense, related facts about his troubled childhood, and submitted poems and stories he wrote in prison.

On rebuttal, the People introduced statements by defendant to the effect that he was born or trained to be a killer and always wanted to be a killer.

### II. Special Circumstance Contentions

■ Before addressing defendant's specific contentions, we observe that, by reason of our decision in *People* v. *Anderson, supra,* 43 Cal.3d 1104,

overruling *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, any asserted errors pertaining to the contested intent-to-kill issue were necessarily harmless. *Anderson* overruled *Carlos*'s holding that the 1978 death penalty law imposes a blanket intent-to-kill requirement on all felony-murder special circumstances. *Anderson* held that intent to kill need be charged and proved for a felony-murder special circumstance only where the defendant was an aider and abettor to the homicide and not the actual killer. (43 Cal.3d at pp. 1138-1147.) Here, defendant does not dispute, and the evidence confirms, that he personally killed Mrs. Lyman in the commission of a burglary of her house. As we have recently held, *Carlos* should not be deemed "the law of the case" in light of *Anderson* and, accordingly, many of defendant's present challenges to the special circumstance finding on retrial may be deemed irrelevant. (See *People* v. *Whitt* (1990) 51 Cal.3d 620, 637-639 [274 Cal.Rptr. 252, 798 P.2d 849].)

### A. *Disclosure of Defendant's Prior Reversed Death Sentence*

During the jury selection process, and on voir dire, the court informed the jurors that a previous jury had convicted defendant of first degree murder and burglary and had sentenced him to death, but that this court, on defendant's automatic appeal, had ordered a retrial of the special circumstance and penalty issues because "the rules had changed" regarding the need to instruct on the issue of defendant's intent to kill. Defendant made no objection to these voir dire disclosures. He now contends, however, that the trial court erred in relating the foregoing information to the jury.

■ Defendant contends that, by reason of the court's disclosures, the jury improperly learned that a prior jury had found death to be the appropriate penalty for defendant, that the jury's verdict was subject to an automatic appeal to this court, and that we reversed the death judgment and special circumstance finding based on a "change of rules" regarding the need to prove defendant's intent to kill.

Initially, defendant suggests that the foregoing information was irrelevant and potentially prejudicial, coming at a time (October and November 1985) when this court's disposition of death penalty cases was becoming a subject of discussion and controversy. Defendant argues that the jury was thereby led to speculate on impermissible matters, including the availability of an appeal to this court, a matter tending to reduce the jury's sense of responsibility regarding the seriousness of its task. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 155-159 [207 Cal.Rptr. 800, 689 P.2d 430].) Although defendant does not concede the point, it seems clear that any possible

prejudice resulting from the court's disclosures was limited to the jury's penalty determination, for the evidence supporting the felony-murder special circumstance was overwhelming.

■ As we recently observed, "The fact that a first jury deadlocked, *or the numerical vote of the first jury*, is irrelevant to the issues before the jury on a penalty retrial." (*People* v. *Thompson* (1990) 50 Cal.3d 134, 178 [266 Cal.Rptr. 309, 785 P.2d 857], italics added.) Defendant argues that, by a parity of reasoning, the first jury's vote to impose death was irrelevant to the issues. No reason appears why the court could not have simply explained that the judgment had been reversed and remanded for retrial, without also disclosing the first jury's verdict.

Defendant cites several federal cases recognizing the prejudicial nature of disclosing to a jury engaged in determining a defendant's guilt or innocence the fact that the defendant had been previously convicted on the same charges. (E.g., *United States* v. *Bagley* (9th Cir. 1985) 772 F.2d 482, 488 [dictum]; *United States* v. *Williams* (5th Cir. 1978) 568 F.2d 464, 471.) Defendant also cites an Illinois case (*People* v. *Hope* (1986) 116 Ill.2d 265 [508 N.E.2d 202, 205-206]), which reversed a judgment on the ground that two jurors in the sentencing phase of a capital case were exposed to news stories indicating the defendant had been previously sentenced to death on charges unrelated to the capital case being tried.

In the present case, the court disclosed that a prior jury had imposed the death penalty on defendant for the same offense. A similar disclosure was made to the jury in *People* v. *Whitt, supra*, 51 Cal.3d at pages 639-641, involving another retrial for *Carlos* error. In *Whitt*, without reaching the merits, we concluded that any error in informing the jury regarding the prior death sentence and subsequent reversal on automatic appeal was invited by defendant's own conduct in (1) submitting, at the court's direction, a proposed statement covering these matters (without referring to the automatic nature of the appeal), and (2) failing to object to the court's own statement covering these matters. We further opined that defense counsel had tactical reasons for not objecting to the statement, namely, his reliance on a penalty phase defense of "Death Row redemption," to the effect that defendant had reformed after being initially sentenced to die.

Similar reasoning governs our decision here. Prior to trial, defense counsel asked the court whether the jury would be told about the procedural history of the case. The court announced its intention to "pretty much level" with the jury and explain about the prior trial, death sentence, reversal on automatic appeal, and the reason for the reversal. Defense counsel was given a copy of the court's intended statement but failed to object or

propose revisions to the draft. ■ As the People observe, objections to noninstructional statements or comments by the trial court must be raised at trial or are waived on appeal. (E.g., *People* v. *Terry* (1970) 2 Cal.3d 362, 398 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Cheary* (1957) 48 Cal.2d 301, 316 [309 P.2d 431]; cf. § 1259 [objection not required to preserve claim of *instructional* error on appeal].)

■ As in *Whitt*, *supra*, 51 Cal.3d 620, it seems apparent that defense counsel herein had a tactical purpose for declining to object to the court's disclosures regarding defendant's death sentence and subsequent reversal on automatic appeal. During the course of trial and in argument, counsel frequently referred to the prior death sentence and, as in *Whitt*, presented a "Death Row redemption" defense stressing defendant's changed attitude, reformed character and his many useful, redeemable skills. For example, counsel asked defendant whether his "thinking" had changed during the five years since he was sentenced to death. Defendant replied that "the experience of being condemned to die made me grow up and realize that it was a serious matter. And I matured. And I realized there's more to life than living and the life that I had lived. And maybe I had a chance to change."

■ Regarding the reference to the automatic appeal, it is true that "[a]s a general rule, the jury should not be advised regarding the availability of an appeal in death cases, because such information may dilute the jury's sense of responsibility in fixing the penalty. [Citations.]" (*People* v. *Hovey* (1988) 44 Cal.3d 543, 584 [244 Cal.Rptr. 121, 749 P.2d 776]; see *Caldwell* v. *Mississippi*, *supra*, 472 U.S. 320.) But as *Whitt* explains (51 Cal.3d at p. 641), any reasonable juror, knowing that defendant was once sentenced to death and was now being retried for the same crimes, could easily infer that an appeal was available to him.

■ We conclude that any error in the court's pretrial disclosures was waived by counsel's apparently tactical failure to object. We further conclude that it is not reasonably possible defendant was prejudiced by those disclosures.

■ In a related contention, defendant complains of the prosecutor's reference to the fact that defendant had previously received a death sentence which was "unfortunately" reversed. Thus, in the course of suggesting that defendant's "redemption" was feigned, the prosecutor observed that "We had him here. We had him tried. We had him convicted. We had him sentenced to death . . . . And then unfortunately, the case was reversed and it came back to trial." No objection was made to these remarks (see *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468]),

which included no factual information not already recounted by the trial court's pretrial disclosures. The prosecutor's disappointment with the reversal of the judgment was hardly a surprising revelation.

B. *Trial Court Comments Effectively "Directing a Verdict"*

██ Defendant contends that additional trial court comments essentially directed the jury to find true the special circumstance allegation, and that these comments require reversal of the judgment. We disagree.

The court at one point noted its "reasonable expectation" that deliberations would commence on Thursday, December 19, that "very likely" a special circumstance verdict would be reached on that day, and that any further deliberations, if needed, would take place the following day in view of the forthcoming holiday recess. Thereafter, prior to closing arguments, the court indicated the issue of defendant's intent to kill was a "fairly simple question," and stated that presumably a verdict would be reached within two or three hours.

Defendant did not object to the foregoing remarks, and accordingly waived any claim of error based thereon. (*People* v. *Terry, supra,* 2 Cal.3d 362, 398; *People* v. *Cheary, supra,* 48 Cal.2d 301, 316.) On the merits, the court's statements do approach the kind of coercive conduct deemed improper in prior cases. In *People* v. *Keenan* (1988) 46 Cal.3d 478, 534 [250 Cal.Rptr. 550, 758 P.2d 1081], we admonished that "A trial judge should refrain from placing specific time pressure on a deliberating jury and should never imply that the case warrants only desultory deliberation. Such comments risk persuading legitimate dissidents, whatever their views, that the court considers their position unreasonable." (See also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 775 [230 Cal.Rptr. 667, 726 P.2d 113] [coercion through insistence on further deliberations].)

Here, of course, the jury had not yet commenced its deliberations and no "dissidents" had yet voiced their concerns. Nonetheless, we think trial judges should avoid any potentially coercive "predictions," at any stage of the trial, concerning the ease with which the jury should decide the case or particular issues. In any event, as previously explained, any error in the determination of the intent to kill issue was necessarily harmless in light of *People* v. *Anderson, supra,* 43 Cal.3d 1104. In addition, it is not reasonably possible the court's remarks, directed to the special circumstance issue, could have affected the jury's penalty decision.

C. *Voluntariness of Defendant's Confession*

At trial, defendant contended his tape-recorded confession and a subsequently filmed reenactment were involuntary and hence inadmissible

because the statements were made (1) while he was suffering from sleep deprivation, and (2) without adequate *Miranda* warnings or waivers (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). Following a foundational hearing, the court ruled the confession and reenactment were voluntary and admissible.

1. *Statements to Police*—In his recorded statement to the officers, defendant admitted he had been watching the Lyman house for several days from a nearby location. Believing the residents were vacationing, he decided to burglarize the house. He shot Mrs. Lyman when she confronted him unexpectedly. According to defendant, he reacted out of fear, without knowing his victim's identity.

■ In challenging the voluntariness of his confession, defendant points to his own trial testimony indicating he was suffering from sleep deprivation when interrogated. That testimony, if believed, would support a finding that he did not knowingly waive his right to remain silent. Defendant urges us to hold that the prosecution failed to carry its burden of proving the voluntariness of a confession beyond a reasonable doubt. (See *People* v. *Jiminez* (1978) 21 Cal.3d 595, 606-608 [147 Cal.Rptr. 172, 580 P.2d 672] [applicable to cases involving crimes committed prior to the adoption of Cal. Const., art. I, § 28, subd. (d) (Prop. 8) in 1982]; see also *People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042] [Prop. 8 abrogated *Jiminez* rule]; *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149] [Prop. 8 not retroactive].)

■ Our role as a reviewing court is to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found; if conflicting testimony exists, we must accept that version of events which is most favorable to the People, to the extent supported by the record. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 773 [248 Cal.Rptr. 126, 755 P.2d 310].)

■ Here, as the People observe, the facts were conflicting regarding the voluntariness of defendant's confession. Although he testified that he had been awake for 30 hours prior to confessing, other facts support a finding of voluntariness, including his age at the time of the offense (27), his high IQ (136), and his reflective actions during the course of the offenses charged, including the careful and methodical way in which he obtained entry into Mrs. Lyman's house only a few hours prior to his confession. In light of the whole record, defendant's self-serving testimony affords insufficient basis for overturning the trial court's finding of voluntariness.

2. *Statements to Dr. Flanagan*—Several days after defendant made his recorded statement to the officers, and evidently before counsel was ap-

pointed to represent him, the officers introduced him to Dr. Flanagan, a psychiatrist retained to perform a mental examination of defendant. During the interview, which lasted several hours, defendant stated that he was sober during the burglary, that he thought the Lyman house was unoccupied, and that he was surprised when Mrs. Lyman confronted him. Dr. Flanagan concluded defendant was alert, cooperative and intelligent.

■■■ Defendant now asserts his statements to Dr. Flanagan violated his Fifth Amendment rights because they were elicited without adequate warning that Dr. Flanagan was an agent of the prosecution and this purpose was to obtain incriminating information. We disagree. After introducing Dr. Flanagan, and immediately before the psychiatric interview began, Officer Daw gave defendant full *Miranda* warnings, including the admonition that, "Anything you say can and will be used in evidence against you in a court of law." Defendant thereupon waived his rights and agreed to talk. Dr. Flanagan himself cautioned defendant that his statements would not be deemed confidential. Under the circumstances, the foregoing admonitions were sufficient. (See *Estelle* v. *Smith* (1981) 451 U.S. 454, 466-469 [68 L.Ed.2d 359, 371-373, 101 S.Ct. 1866].)

### D. The "Cooked Noodles" Evidence

■■■ During retrial of the special circumstance issue, the prosecutor was permitted to introduce evidence that defendant, after killing Mrs. Lyman, remained in her house, and cooked and ate a bowl of noodles. Rejecting defendant's objection that the evidence was irrelevant and unduly prejudicial (see Evid. Code, § 352), the court ruled that the evidence, though not conclusive, was sufficiently probative of defendant's mental state and intent as to warrant its admission.

Defendant claims the court erred in admitting the evidence and later permitting the prosecutor during the penalty phase to call additional witnesses to confirm the incident. We find no error. As the People observe, the fact that defendant had the presence of mind to calmly cook and eat noodles after killing Mrs. Lyman indicated a lack of concern or remorse usually associated with an accidental or unintentional killing, and accordingly bore on the disputed issue of defendant's intent to kill. In any event, any evidentiary error seems harmless with respect to the special circumstance finding in light of *People* v. *Anderson, supra*, 43 Cal.3d 1104. As for calling additional penalty phase witnesses to prove the point, the People reasonably deemed it appropriate to call these witnesses after defendant took the stand and recanted his recorded statement and denied cooking or eating the noodles.

### E. *Prosecutorial Misconduct*

■ Defendant asserts the prosecutor committed misconduct in various respects during her closing arguments regarding the special circumstance issue. Because defendant failed to object to the statements, or request an appropriate admonition, his misconduct claims are deemed waived on appeal. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.) Nonetheless, we briefly review them here.

1. *Burden of Proof and Presumption of Innocence*— ■ The prosecutor used a baseball analogy in describing the state's burden of proof, stating that just as a tie "goes to the runner" in baseball, an "evidentiary tie" in a criminal case benefits the defendant. Defendant now complains that the jury may have interpreted that remark as meaning that defendant would prevail only if the evidence were closely balanced ("tied"), but would lose, despite a reasonable doubt, if the prosecution's case slightly outweighed the defense.

We have reviewed the remarks in context and find no misconduct, for the prosecutor appears to have been merely observing that conflicting testimony and inferences must be resolved in defendant's favor. In any event, defense counsel amply clarified the matter during his own closing argument, and thereafter the court correctly instructed on the subjects of reasonable doubt and burden of proof. (See CALJIC No. 2.90.)

The prosecutor also observed during closing arguments that although the court would instruct on reasonable doubt and the presumption of innocence, "in this particular case, there isn't a presumption of innocence because he's been convicted." Although defendant now finds the comment objectionable, in context it seems harmless, referring only to the prior *murder* conviction which, as the jury was advised, was not the subject of retrial.

2. *Comment on Defendant's Failure to Testify*— ■ During closing argument on the special circumstance issue, the prosecutor commented that only two persons could "tell us about what went on" during the night of the murder, namely, deceased victim Lyman and defendant, who "told you his version through the interview with the police." The prosecutor continued by noting that parts of the statement should be believed, and parts disbelieved. Defendant now claims the remark constituted an improper comment on defendant's failure to testify. (See *Griffin* v. *California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229].)

*Griffin* forbids either direct or indirect comment on the defendant's failure to testify, but does not extend to mere comments on the state of the

evidence or the failure of the defense to present material evidence. (See *People* v. *Hovey, supra,* 44 Cal.3d 543, 572 [finding nonprejudicial *Griffin* error in prosecutor's remark, "He's never said anything to you about why, why he did these things"].) The prosecutor's statement that defendant was one of two persons who could "tell" about the murder approaches indirect comment on defendant's failure to testify, but the prosecutor's further observation that defendant in fact told his version of the facts during the police interview substantially lessened any risk that the jury might penalize defendant for remaining silent at trial.

In any event, as stated in *Hovey,* the remark was "indirect, brief and mild . . . without any suggestion that an inference of guilt be drawn therefrom." Such remarks "are uniformly held to constitute harmless error. [Citations.]" (44 Cal.3d at p. 572.) We find the prosecutor's remark herein similarly harmless.

3. *Reference to Punishment*—During closing arguments on the special circumstance issue, the prosecutor stressed that defendant was the one responsible for "what he did that night," and that "he's the one that should pay for what he did that night." ▪▪▪ According to defendant, the prosecutor was urging the jury to consider matters of punishment inappropriate at the special circumstance retrial. The People, on the other hand, suggest the prosecutor was simply asking the jury to find defendant responsible for a murder accompanied by a special circumstance. As an interpretive matter, we tend to agree with the People. In any event, the prosecutor's brief remark was too mild to have resulted in any possible prejudice to defendant.

4. *Injection of Personal Belief*— ▪▪▪ Defendant contends the prosecutor injected her own personal belief into her argument when she disparaged defendant's defense based on lack of intent to kill, characterizing it as a "smokescreen" and suggesting it was "not true," and then stating, "We knew that beforehand. But it was for the purpose of keeping an open mind." According to defendant, the prosecutor's "beforehand" remark implied to the jury the prosecutor held a personal belief as to defendant's intent, based on evidence outside the record. (See *People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) To the contrary, examined in context the prosecutor's remarks had a far less sinister connotation, referring merely to the *jurors'* (and not the prosecutor's) prior knowledge.

Thus, the prosecutor first reminded the jury that, during voir dire, the court had asked each juror to keep "an open mind" on the subject of defendant's intent to kill. The prosecutor then suggested that, although the jurors may have kept an open mind during the presentation of evidence, they nonetheless knew "beforehand" that anyone who enters another

person's house late at night, armed with a loaded firearm, necessarily possesses the requisite intent to kill. One reasonably might disagree with the prosecutor's assumption in this regard, but clearly her remarks did not constitute *Bain* error (*supra*, 5 Cal.3d 839).

We conclude that none of the prosecutor's various remarks constituted misconduct, and that in any event defendant has waived any misconduct claim by failing to object or seek an appropriate admonition.

### F. *Statement Regarding M-1 Rifle*

In a taped interview with police officers, defendant indicated that although he did not attempt to escape from Mrs. Lyman's house when the police arrived and announced their presence, nonetheless "If I'd have had my M-1 Carbine, yeah, I'd have come out. But I don't—I didn't have it." The trial court admitted the statement at the special circumstance phase over defendant's objection, reasoning that it was relevant to the issue of his state of mind at the time of the killing.

■ Defendant renews his objection on appeal, claiming the statement was irrelevant to the contested issue of his intent to kill, and further was unduly prejudicial when weighed against any slight relevance his remark might have had. We disagree. The statement was clearly relevant for it indicated that defendant would have initiated a gun battle with police if he had been armed with his rifle, thus disclosing defendant's readiness to react violently when he had the opportunity to do so. We conclude the trial court did not abuse its discretion in finding the statement's relevance outweighed its prejudicial effect.

### G. *Photograph of Mrs. Lyman and Her Daughter*

Defendant objected to the prosecutor's introduction at the special circumstance phase of a photograph showing Mrs. Lyman with her adult daughter. The court overruled the objection, noting that the photo was simply an ordinary, nongruesome one, and that the jury was already aware Mrs. Lyman had a daughter. The court stated that the photo was not the sort that would either shock the jury or arouse any sort of passion or sympathy.

■ Defendant now argues the photo was irrelevant to any issue and could only have been used for the improper purpose of gaining the jury's sympathy for the victim's family. (See *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529].) We considered a similar claim of error in *People* v. *Hovey, supra*, 44 Cal.3d 543, 576, involving the

prosecutor's use, at both the guilt and penalty phases, of a "portrait"-style photograph of the young murder victim for the apparent purpose of gaining sympathy for her. As we stated in *Hovey*, "Although admission of a photograph of the victim while alive may be considered error if irrelevant to any contested issue in the case, any error here was harmless. [Citations.] [¶] [The victim's] photo, though perhaps 'charming,' was nonetheless an 'ordinary' one not likely to produce a prejudicial impact." (44 Cal.3d at p. 571.)

We have examined the photo in question and conclude, as in *Hovey* and similar cases, that its introduction could not have prejudiced defendant. (See, e.g., *People* v. *Hendricks* (1987) 43 Cal.3d 584, 594-595 [238 Cal.Rptr. 66, 737 P.2d 1350].)

### III. PENALTY PHASE ERRORS

#### A. *Asserted Boyd Error*

In *People* v. *Boyd* (1985) 38 Cal.3d 762, 773-776 [215 Cal.Rptr. 1, 700 P.2d 782], we examined section 190.3 and concluded that at the penalty phase, "Evidence of defendant's background, character, or conduct which is not probative of any specific listed factor would have no tendency to prove or disprove a fact of consequence to the determination of the action, and is therefore irrelevant to aggravation." (38 Cal.3d at p. 774.) ▮ Defendant argues the trial court committed reversible *Boyd* error by allowing the prosecution to introduce incidents of nonviolent criminal activity, or of noncriminal activity.

According to defendant, the prosecutor's penalty phase evidence included such irrelevant matters as (1) defendant's long-standing lack of gainful employment, (2) his various unadjudicated burglaries, and (3) his use of an alias. Our examination of the record indicates none of these claims has merit. With respect to defendant's employment record, he opened the door by introducing, in mitigation of penalty, evidence of his various jobs and participation in a work furlough program. In response, the prosecutor was entitled to explore whether defendant had been able to hold steady employment.

As for defendant's burglaries, the record indicates that defendant was indeed convicted of these offenses, a matter properly considered as an aggravating factor. (See § 190.3, factor (c).) Finally, the matter of defendant's use of an alias was raised by him during the course of a tape-recorded interview with police. Defendant waived any claim of error by failing to object when the tape, and his reference to using an alias, was played to the

jury. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 777-778 [251 Cal.Rptr. 83, 759 P.2d 1260].)

We conclude that no *Boyd* error (*supra*, 38 Cal.3d 762) occurred here. In any event, any such error involved minor matters that could not possibly have affected the penalty verdict.

B. *New Mexico Assault*

■ Defendant contends the court erred in allowing the prosecutor to admit evidence that defendant participated in an armed assault in New Mexico in 1971, 14 years prior to the penalty phase retrial in this case. According to defendant, the evidence was too remote to be of any value as aggravating evidence and, accordingly, should have been excluded.

Possible remoteness of the defendant's prior offenses is not a proper ground of exclusion under section 190.3, as remoteness affects the weight, not admissibility, of the offense. (See *People* v. *Frank* (1990) 51 Cal.3d 718, 729 [274 Cal.Rptr. 372, 798 P.2d 1215]; *People* v. *Douglas* (1990) 50 Cal.3d 468, 511, 531 [268 Cal.Rptr. 126, 788 P.2d 640].)

In addition, we note that defendant did not object to the evidence when admitted at trial (*People* v. *Coleman*, *supra*, 46 Cal.3d at pp. 777-778), and that although the offense occurred 14 years prior to the penalty retrial in this case, it was committed only 8½ years prior to Mrs. Lyman's murder. We conclude that introduction of the evidence affords defendant no basis for reversal.

C. *Defendant's Hearsay Statement*

The prosecution was permitted to introduce on rebuttal at the penalty phase defendant's remark to police officers that he was "either born or trained to be a killer," and "always wanted to be a killer." Defendant had objected to the introduction of such evidence as constituting improper rebuttal evidence and inadmissible hearsay. The trial court ruled, however, that the statement was admissible as a relevant declaration against defendant's interest.

■ Defendant, acknowledging the statement at issue was a mere "bravado" boast, nonetheless asserts its admission was reversible error. He contends the statement was inadmissible as a declaration against his interest because, among other reasons, he was available as a witness at the penalty phase. (See Evid. Code, § 1230.) But as the People explain, the trial court's ruling can be sustained on a separate ground not relied on, namely, that the

statement was an admission relevant to rebut defendant's own penalty phase testimony that he had no malicious intent to kill his three murder victims (Mrs. Lyman, and two "other crimes" victims, Blundell and Glashien), as well as to rebut his general "good character" evidence. (See *id.*, § 1220; *People v. Wright, ante,* p. 367 [276 Cal.Rptr. 731, 802 P.2d 221]; *People v. Rodriguez, supra,* 42 Cal.3d at pp. 791-792; *People v. Boyd, supra,* 38 Cal.3d 762, 775-776.)

Although defendant's "killer" remark would not conclusively rebut his good character evidence, it was certainly relevant to the inquiry. As the trial court observed, defendant's penalty phase evidence attempted to depict him as "not the type of a person who would go around killing people, except on extreme provocation. [¶] This [referring to defendant's remark] is a statement by him which contradicts that image . . . ."

■■■ Defendant contends the trial court failed explicitly to weigh the purported relevance of the statement with its likely prejudice to defendant. (See Evid. Code, § 352; *People v. Green, supra,* 27 Cal.3d at p. 25.) Here, defense counsel based his objection on three grounds: that the statement was not admissible as a statutory aggravating factor, that it was hearsay, and that it constituted improper rebuttal. *After* the court denied his objection, he asked that the record reflect that the evidence was "highly prejudicial," without citing Evidence Code section 352, or requesting a weighing of relevance with prejudice, and the court reiterated its ruling.

We think that under the foregoing circumstances, including the belated invocation of an objection based on "prejudice," the trial court was not obligated to make an express ruling weighing relevance and prejudice under Evidence Code section 352. We note that the requirement of such an explicit ruling can be a trap for a trial judge presented, as here, with multiple objections to the same evidence. For that reason, we think the requirement should be triggered only if defendant either expressly invokes Evidence Code section 352 as a ground for objection, or at least affirmatively argues that the risk of prejudice outweighs the relevance of the proffered evidence. (Cf. *People v. Ainsworth* (1988) 45 Cal.3d 984, 1009-1010 [248 Cal.Rptr. 568, 755 P.2d 1017] ["the probative/prejudicial issue was before the court" because of defense counsel's reference, in his objection, to the "danger of undue prejudice" outweighing "the probative value" of the challenged evidence]; *People v. Anderson, supra,* 43 Cal.3d at p. 1129, fn. 3 [defendant failed "even to allude to Evidence Code section 352"]; *People v. Frank* (1985) 38 Cal.3d 711, 732 [214 Cal.Rptr. 801, 700 P.2d 415] [defendant "invoked Evidence Code section 352 several times"]; *People v. Green, supra,* 27 Cal.3d at p. 24 [counsel's argument that probative value is outweighed by prejudicial effect impliedly invoked Evidence Code section 352].)

### D. *Officer Thompson's Testimony*

Officer Thompson testified for the People during the penalty phase concerning his investigation of the Glashien and Blundell killings. He recounted defendant's confession to those crimes as well as defendant's vague statements concerning other murders he purportedly committed in Las Vegas. On cross-examination, Thompson admitted that he doubted the veracity of defendant's confession to the Las Vegas killings, and he observed that no law enforcement officers contacted by him credited it. On redirect, Thompson stated his further belief that defendant's confession to the Glashien and Blundell killings, being supported by sufficient details, was true. Defendant did not object to the foregoing testimony.

 Defendant now observes that a police officer's opinion regarding the truthfulness of a suspect's confession is generally deemed inadmissible. (See *People* v. *Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435]; *People* v. *Arguello* (1966) 244 Cal.App.2d 413, 421 [53 Cal.Rptr. 245].) His failure to object, however, bars our consideration of the point on appeal. (See, e.g., *People* v. *Coleman, supra*, 46 Cal.3d 749, 777-778.)

### E. *Asserted Prosecutorial Misconduct*

Defendant complains of various instances of misconduct by the prosecutor during closing arguments at the penalty phase. We find no prejudicial misconduct.

1. *Vouching for Law Enforcement Officers' Credibility, and Attacking Defendant's Credibility*—At one point in her argument, the prosecutor remarked that "A law enforcement officer is no good as a witness if his credibility is in doubt," and in essence supported the credibility of the officers testifying in this case by noting that "a number of them . . . are old, experienced officers. They've got 15, 20, 22 years of experience on the force." The prosecutor expressed her doubt that any of them would "jeopardize" his reputation by lying on the witness stand "just to convict one defendant." The prosecutor continued by noting that defendant, on the other hand, would only be testifying once, rather than a number of times, that he "doesn't have anything else to lose," and "so what if you do catch him in a few lies?"

 Defendant failed to object, or seek an admonition, as to any of these remarks, and accordingly he cannot raise a claim of misconduct on appeal. (*People* v. *Green, supra*, 27 Cal.3d 1, 27.) Nonetheless, we briefly review the merits of his argument that the prosecutor's comments violated

his state and federal constitutional rights and constituted reversible misconduct.

The prosecutor is generally precluded from vouching for the credibility of her witnesses, or referring to evidence outside the record to bolster their credibility or attack that of the defendant. (See *People* v. *Harris* (1989) 47 Cal.3d 1047, 1079 [255 Cal.Rptr. 352, 767 P.2d 619]; *People* v. *Guzman* (1988) 45 Cal.3d 915, 941 [248 Cal.Rptr. 467, 755 P.2d 917], and cases cited.) In the present case, the prosecutor limited her remarks to *facts of record*, namely, the years of experience of the officers involved, and her "vouching" was clearly based on inferences reasonably drawn therefrom, rather than on her personal belief or knowledge. (See *People* v. *Adcox* (1988) 47 Cal.3d 207, 258-259 [253 Cal.Rptr. 55, 763 P.2d 906] [prosecutor's arguments were based on inferences warranted by the evidence, rather than personal belief].) We find no improper prosecutorial vouching here.

2. *Reference to Utah's Failure to Extradite*—In cross-examining prosecution witnesses, defense counsel elicited the fact that the State of Utah had not attempted to extradite defendant for the Blundell and Glashien murders, thereby implying that the evidence of his guilt was weak. Thereafter, in her closing argument, the prosecutor suggested an alternative theory for Utah's lack of action, namely, that California's prosecution of defendant adequately satisfied Utah's interest in bringing him to justice.

██ Defendant, having objected to the prosecutor's remark at trial, characterizes such argument as speculative and improper, being based on the prosecutor's personal opinion, rather than any evidence in the record. Again, as with the "vouching" issue, the prosecutor was entitled to draw reasonable inferences from the evidence, and the prosecutor's suggested explanation for the failure to extradite was a plausible alternative to the one suggested by defense counsel. We see no misconduct here.

3. *Argument That Sympathy for Defendant Does Not Outweigh Aggravating Circumstances*— ██ In closing argument, the prosecutor remarked that if the jury felt that "sympathy" for defendant outweighed defendant's violent offenses and precluded a death sentence, "then Heaven help our judicial system and our society." Defendant, who objected to the statement at trial, claims that the foregoing remark was unduly inflammatory and prejudicial.

We have stated that "Isolated, brief references to retribution or community vengeance . . . , although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty. [Citation.]" (*People* v.

*Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250].) The prosecutor's statement herein, rather than calling for vengeance or retribution, was directed at the jury's weighing function and indicated the prosecutor's emphatic opinion that, under the circumstances in this case, the aggravating circumstances clearly outweighed any considerations of sympathy for defendant. We have never found such comments improper or prejudicial. (See, e.g., *People v. Hamilton* (1989) 48 Cal.3d 1142, 1182-1184 [259 Cal.Rptr. 701, 774 P.2d 730].)

4. *Argument About Impact on Victims' Families*—The prosecutor in closing argument observed that defendant had expressed a wish to live ("Nobody wants to die"), and further noted that no one asked defendant's victims whether they wished to die. The prosecutor then remarked that Mrs. Lyman's daughter, Pauline, has "feelings" too, and is probably "grateful" she had the chance to spend Mother's Day with Mrs. Lyman a few weeks before her murder.

The People concede that such argument "was arguably inappropriate" under *Booth v. Maryland, supra,* 482 U.S. 496. (See also *South Carolina v. Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876 109 S.Ct. 2207].) *Booth* precludes evidence of the impact of the victim's death on his or her family. *Gathers* makes it clear that comments regarding the victim's character or background made in order to elicit the sympathy or pity of the jury are inadmissible. Both cases held that such evidence is irrelevant to a defendant's decision to kill and to the jury's decision on the appropriate sentence. But neither *Booth* nor *Gathers* bars brief references to the victims or their families. (*Booth, supra,* 482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451]; see also *People v. Douglas, supra,* 50 Cal.3d 468, 536; *People v. Lewis* (1990) 50 Cal.3d 262, 284 [266 Cal.Rptr. 834, 786 P.2d 892]; *People v. Carrera* (1989) 49 Cal.3d 291, 336 [261 Cal.Rptr. 348, 777 P.2d 121].) The prosecutor's references to the victims were indeed far more fleeting than those made in either *Booth* or *Gathers* and reiterated what the jury already knew—that murder is a crime against the victims, their families and society. (*Lewis, supra,* 50 Cal.3d at p. 285.)

Even if we were to conclude that the prosecutor's comments violated the proscriptions of *Booth* or *Gathers*, we would find beyond a reasonable doubt there was no prejudicial error. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) In our view, the prosecutor's brief comments could not have diverted the jury from its task of determining the appropriate punishment. (See *Douglas, supra,* 50 Cal.3d at p. 537.)

5. *Cumulative Effect of Misconduct*—Finally, defendant argues that the cumulative effect of the various prosecutorial misconduct resulted in a

miscarriage of justice warranting a new trial. Yet as we have explained, only one of the prosecutor's remarks was arguably improper, and we believe these remarks had no effect on the jury's verdict.

### F. Questions From Jury

During the penalty phase, various individual jurors directed written questions to the court. One juror asked for "more detail" regarding the evidence of defendant's participation in the prison chapel program and its "effect" on him. The next day, another juror inquired about such matters as defendant's whereabouts when his son was born, his marital status, and his feelings toward his son. Subsequently, a third juror asked whether a person sentenced to life imprisonment without parole is segregated from the general prison population, could attain "trustee" status, or could be released from prison at some future time. Defendant asserts two separate claims of error arising from these questions and the court's responses thereto.

#### 1. Jury Misconduct

Defendant first claims the jury committed misconduct by prematurely submitting the foregoing questions to the court prior to starting its deliberations. Defendant observes that deliberations do not commence until all evidence is presented and the jury is instructed. Until that time, the jurors should not converse with each other or form or express any opinion about the case. (§ 1122.) We find no misconduct here.

The authorities cited by defendant in support of his theory of "premature deliberation" are inapposite, as none of them suggests that mere questions from individual jurors prior to actual deliberations constitute jury misconduct. (See, e.g., *People* v. *Pierce* (1979) 24 Cal.3d 199, 206-207 [155 Cal.Rptr. 657, 595 P.2d 91] [prior to conclusion of defense case, juror discussed case with police officer/witness]; *People* v. *Brown* (1976) 61 Cal.App.3d 476, 480-481 [132 Cal.Rptr. 217] [prior to conclusion of People's case, juror expressed to other juror his opinion of defendant's guilt].) As noted in *People* v. *McAlister* (1985) 167 Cal.App.3d 633, 644 [213 Cal.Rptr. 271], "In a proper case there may be a real benefit from allowing jurors to submit questions [to witnesses] under proper control by the court."

Contrary to defendant's thesis, we do not believe that the questions tendered here indicated the jurors had commenced their deliberations or had formed any tentative conclusions regarding the appropriate penalty. Accordingly, we cannot conclude the questions posed here constituted misconduct.

## 2. *Court's Inadequate Responses*

As previously indicated, some of the jurors' inquiries concerned the status, privileges and potential for release of a prisoner serving a sentence of life without possibility of parole. Responding to the potential for release, the court stated that "Life imprisonment without the possibility of parole means exactly that," admonishing the jurors not to assume anything "other than death means death by execution in the gas chamber; life without possibility of parole means imprisonment for the rest of his natural life." Defendant does not suggest the court's response was inadequate or improper in any way. (See, e.g., *People* v. *Caro* (1988) 46 Cal.3d 1035, 1064-1065 [251 Cal.Rptr. 757, 761 P.2d 680].)

■ In response to the jury's other inquiries, however, the court stated in essence that no evidence had been received on these points, and no one was available to testify competently about them. Defendant argues this response, though "technically correct," was inadequate, failing to constitute a "firm reiteration that LWOP [life imprisonment without parole] *meant* LWOP and that there was nothing in the law or in the way the state prison system operated that ameliorated the LWOP sentence." We disagree. The court's response essentially advised the jury not to speculate regarding the possible privileges and conditions of prison confinement. In light of the court's additional response to the basic question whether defendant might someday be released to society, the jury could not possibly have been misled in the matter.

## G. *Jury's Renewed Deliberations*

After deliberating over penalty for six days, one juror was injured and replaced by an alternate juror. The court instructed the jury to set aside and disregard its prior deliberations and recommence them with the alternate juror present. ■ Defendant asked the court to examine the jurors as to their ability to set aside their prior deliberations. The court denied the motion, stating its assumption the jury would be able to follow the foregoing instructions (citing *People* v. *Collins* (1976) 17 Cal.3d 687, 694 [131 Cal.Rptr. 782, 552 P.2d 742]), and observing that voir dire on the subject might be seem by the jurors as "coercive."

In *Collins*, we rejected the contention that a mistrial must be declared whenever the jury's deliberations were interrupted by dismissal of a juror for cause, providing an alternate juror is available as a substitute, and the jury is instructed to set aside and disregard all past deliberations and begin deliberating anew. (17 Cal.3d 687, 694.) We stated that "We are confident

that juries made aware of the rights involved will faithfully follow such instructions." (*Ibid.*, fn. omitted.)

It is clear that the court followed *Collins*'s (*supra*, 17 Cal.3d 687) prophylactic procedures and gave the instructions we recommended in that case. Indeed, the court even required the new jury to pick a different foreperson. Defendant, disputing that *Collins* and the cautionary instructions it prescribed adequately protected his right to jury trial untainted by any prior deliberations, asserts the trial court abused its discretion in failing to conduct voir dire examination of each juror. *Collins* does not require such a procedure, and we see no basis for reconsidering our decision in that case.

Defendant also asserts the court erred in allowing some jurors, over his objection, to retain notes taken prior to the interrupted deliberations. The record indicates, however, that these notes did not involve the jury's deliberations. In one case, they summarized trial testimony, while in another they reflected the private, uncommunicated thoughts of a juror, made while he was at home. Defendant speculates that "the possibility exists that outside influences, e.g., consultation of a dictionary for interpretation of legal terms, entered the jury room." Such speculation cannot form the basis for a successful attack on the verdict or judgment. As the People observe, a juror's thinking process necessarily continues outside the jury room. We see nothing improper in allowing a juror to reduce his thoughts to writing, and privately to consult those notes during deliberations.

### H. *Overemphasizing Defendant's Prior Crimes*

█ Defendant observes that the court's penalty phase instructions included 22 pages devoted to the elements, burden of proof and evaluation of evidence of his prior criminal activity. Although he made no objection to the number or content of these instructions (see § 1259), he now asserts their "sheer bulk" may have unduly focused the jury's attention on the "other crimes" issues, distracting it from its primary duty to weigh the aggravating and mitigating factors. (Cf. *People* v. *Phillips* (1985) 41 Cal.3d 29, 72-73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].)

The instructions given by the court were presumably deemed necessary to assist the jury in properly evaluating the aggravating aspects of defendant's prior criminal activity, and in assisting it to determine whether such offenses were established beyond a reasonable doubt. (Cf. *People* v. *Ghent, supra*, 43 Cal.3d 739, 773.) Defendant does not suggest that any of these instructions was incorrect or misleading, and we cannot base error solely on speculation regarding the jury's inability to digest that material without undue distraction from its sentencing task.

## I. *Modification of Sentence Hearing*

The trial court, after stating its reasons, denied defendant's motion to modify the death verdict. (§ 190.4, subd. (e).) ■■■ Defendant first contends the court's statement of reasons failed to explain why defendant's "sadly unremarkable" murder of Mrs. Lyman justified the death penalty. According to defendant, in the absence of more egregious or heinous facts, the court erred in failing to reduce the sentence to life imprisonment without parole. We disagree.

The trial court was not required to "justify" the imposition of the death penalty in this case. By reason of the burglary-murder special-circumstance finding, defendant fell within that class of persons deemed by law to merit the death penalty if aggravating circumstances outweighed mitigating ones. The court's statement of reasons outlined the relevant evidence, including defendant's probable knowledge that Mrs. Lyman was in the house when he entered it, his lack of intoxication, and his cold-blooded act of shooting her as she lay in bed. Describing defendant as "the type of person who doesn't *really care whether somebody else lives or dies*," as long as it suits his convenience, the court concluded that "if there is to be a death penalty, there is no legitimate excuse why it should not be applied to this case."

Although the court could have mentioned even more aggravating facts to support its decision, including defendant's violent criminal background, on the present record we see no basis for overturning that decision. (See *People v. Hernandez* (1988) 47 Cal.3d 315, 373-374 [253 Cal.Rptr. 199, 763 P.2d 1289].)

■■■ Defendant also complains that the trial court failed affirmatively to ask defendant or his counsel for their comments prior to ruling on the motion to modify the sentence. (Counsel did express some views on defendant's reformed character *after* the court's announcement of its ruling.) The People observe, however, that defense counsel had ample opportunity to address the court prior to the court's ruling. The record shows that counsel, when asked, "Is there any legal cause why judgment should not now be pronounced?," acknowledged that his motions for new trial and modification of sentence were before the court, and he then proceeded to argue the new trial matter (based on the substitution of the alternate juror during the penalty phase). Counsel freely elected to withhold oral argument on the modification motion. Under these circumstances, the court was not required to expressly request argument on the motion before announcing its ruling thereon.

## J. Constitutional Challenges

Finally, defendant asserts various constitutional challenges to the 1978 death penalty law and sentencing procedures. He acknowledges that all such challenges have been rejected by this court in recent opinions. (See, e.g., *People v. Jennings* (1988) 46 Cal.3d 963, 992 [251 Cal.Rptr. 278, 760 P.2d 475]; *People v. Bonin* (1988) 46 Cal.3d 659, 698-704 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People v. Miranda* (1987) 44 Cal.3d 57, 102-107 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People v. Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People v. Jackson* (1980) 28 Cal.3d 264, 315-317 [168 Cal.Rptr. 603, 618 P.2d 149]; *People v. Frierson* (1979) 25 Cal.3d 142, 172-188 [158 Cal.Rptr. 281, 599 P.2d 587].) He states no compelling reasons which might induce us to reconsider these decisions. (See also *Boyde v. California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]; *Blystone v. Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078].)

The judgment of death is affirmed.

Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred. Broussard, J., concurred in the judgment.

**MOSK, J.**—I concur in the judgment.

After review, I have concluded that none of the claims that defendant has raised warrants reversal.

I write separately, however, because I am most troubled by a claim that defendant does *not* make—that trial counsel provided ineffective assistance under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15, of the California Constitution.

To succeed, such a claim requires proof by the defendant that (1) counsel's performance was deficient, i.e., his conduct fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been different. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839] [discussing both federal and state constitutional rights]; *Strickland v. Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052] [discussing federal constitutional right].)

As to the first component, proof may indeed be available. Certainly, counsel's performance—or better, nonperformance—with regard to the court's "instruction" on the history of defendant's case appears deficient.

The court effectively—and altogether improperly—informed the jurors that a prior judgment of death had been reversed on a "technicality," viz., the failure to instruct on intent to kill as an element of the felony-murder special circumstance.

In *United States* v. *Williams* (5th Cir. 1978) 568 F.2d 464, 471, the United States Court of Appeal for the Fifth Circuit stated, "[W]e are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged." I am not. More damning still is information—which the court here inexplicably provided—that a jury had previously condemned the defendant to death, but was subsequently reversed on a "technicality."

In spite of the obvious detriment that the court's "instruction" threatened, counsel did nothing, or at least practically nothing, to avoid the harm. Therefore, in this regard his conduct may well have fallen below an objective standard of reasonableness.

As to the second component, however, proof is lacking. On the peculiar facts of this case, prejudice does not appear. The People and defendant litigated the special circumstance and penalty issues "on the merits" without undue reference to the "technicality." In light of the record before this court, it must be presumed that the jury decided those questions on that same basis. Therefore, there is not a reasonable probability that, but for any deficient performance on counsel's part, the result would have been different.

Accordingly, having concluded that reversal is not warranted for ineffective assistance or for any of the reasons presented by defendant, I concur in the judgment.

Appellant's petition for a rehearing was denied February 20, 1991.