Filed 10/7/13  P. v. Martinez CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B245710 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA390633) |
| PASQUAL G. MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Dennis J. Landin, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and James W. Bilderback II, Deputy Attorney General, for Plaintiff and Respondent.

_____

Pasqual Martinez appeals from the judgment entered on his conviction of first degree murder. Before this court the appellant claims that the trial court erred when it failed to grant his motion for a mistrial after a police detective testified during the trial that appellant had been "detained" by police on one occasion for an unrelated gang incident several months before the murder occurred. As we shall explain, appellant has failed to demonstrate prejudicial error as to this claim. The reference to his detention was brief, ambiguous and non-responsive to the question posed, and any error was harmless in light of the other evidence of appellant's guilt presented during the course of the trial. Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On the evening of October 24, 2011, the victim, Ricardo Lopez, his cousin Maria Aaron, Lopez's girlfriend Edelmira Aguirre and her cousin Delia Ochoa went out for the evening planning to go to several nightclubs. They travelled in Lopez's car. After going to several clubs the group purchased food.

Thereafter they drove[1] to Ochoa's apartment near the intersection of Berendo Street and 7th Street in Los Angeles. Aguirre was going to spend the night at Ochoa's apartment. As Lopez doubled-parked the car in front of Ochoa's apartment building, music played on the car radio. Ochoa looked around and saw a man, later identified as appellant,[2] standing across the street.

---

[1] Lopez drove and Aaron sat in the front passenger seat next to Lopez. Ochoa sat in the rear passenger seat behind Aaron, and Aguirre sat in the rear passenger seat behind Lopez.

[2] Ochoa selected appellant from a six-pack photographic line-up. Ochoa wrote on the photograph that "[appellant] had the same similarities of what [she] recalled that night." Aaron also selected appellant from a six-pack photo array. In addition, both Ochoa and Aaron identified appellant in court as the man they saw that evening; they both identified him by his short stature, his facial features, and his attire that evening.

2

Ochoa gathered her belongings and she and Aguirre got out of the car and walked into Ochoa's building.  As Ochoa and Aguirre walked into the lobby, Lopez got out of the car and called out to get Aguirre's attention, and started to approach the apartment building.  Lopez then turned around and walked back toward the car.  Ochoa and Aguirre walked toward the stairs and they sat down so that Aguirre could finish her food.  As Ochoa sat down on the stairs, she saw appellant walk across the street toward Lopez's car.

At the time, Aaron sat in the front passenger seat of the car.  She saw appellant walk in front of the car.  Aaron briefly looked up from her cell phone screen, and made eye contact with appellant, but "didn't really pay attention."

As Lopez stood outside next to the driver's side of car, appellant passed him and then turned around, pulled out a gun from his waistband area, and pointed the gun at Lopez's back and fired.  Aaron heard four or five gunshots.  Ochoa saw the smoke from the gunfire.  Appellant stood by the rear of the car on the driver's side and looked at Lopez, who had fallen to the ground.  Appellant looked at Ochoa, and then ran away toward 7th Street.

Maria Loeza, who was at her window of a nearby apartment complex observed a person matching appellant's description, walking very quickly toward the corner of the intersection.  The man continued up the stairs of the second building from the corner of 7th and Berendo Streets.[3]  The women—Ochoa, Aguirre and Aaron—went to Lopez's aid.

Two Los Angeles Police Officers were a couple of blocks away at the time of the shooting.  They responded to the scene within minutes of hearing the gunshots.  Lopez died as a result of multiple gunshot wounds to his upper body.   Three .38-caliber bullets were recovered from Lopez's body.

---

[3]     Appellant and a number of his relatives lived in an apartment building on the corner of 7th and Berendo Streets.

3

Shortly after the shooting, appellant, who was a member of the Leeward clique of the Mara Salvatrucha (M.S.) gang, drove up to Kevin Diaz, a member of the Francis Locos clique of the M.S. gang, on Catalina Street, a couple of blocks from 7th and Berendo.[4] Appellant stopped his green SUV to warn Diaz to "be careful" because "he just smoked somebody from Temple Street" on 7th and Berendo. Diaz understood the comment to mean that appellant shot and killed someone. Appellant told Diaz that the victim looked like a gang member and that he was screaming "some girl's name." Appellant walked up to the victim because he was playing loud music from his car and because he appeared to be a gang member. Appellant said that he asked the victim where he was from and that the victim responded that he was from Temple Street,[5] a rival gang of the M.S. gang.[6]

Shortly thereafter, Diaz went to 7th and Berendo Streets and saw a body in the street next to a double-parked car. Diaz also saw appellant the evening after the shooting. Appellant told Diaz that the police showed his wife and other people in the building a photograph of his face.[7]

---

[4]     According to Diaz, he and appellant were friends from "the streets." Diaz knew appellant as "Little One" or by his first name, Pasqual. The information that Diaz had about the murder came to the attention of police after Diaz was arrested on an unrelated charge in October 2011. Diaz provided the information in exchange for help to get out of jail.

[5]     Ochoa told the police that she believed that at one time Lopez was a member of the Temple Street gang.

[6]     At trial Diaz describe appellant's attire (chef/cook work clothes) that evening as matching the description of the attire that Aaron had identified.

[7]     During the course of the investigation, police obtained a photograph from a surveillance video taken by video camera located directly across the street from the incident. They showed the photograph to people in the area including people who lived in appellant's building.

As a result of the information Diaz provided, police arrested appellant.[8]  Appellant was charged with first-degree murder in violation of Penal Code section 187.  The information further alleged that appellant personally and intentionally discharged a handgun and that the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang.

During the trial, in addition to the testimony of the eyewitnesses, Diaz and the other witnesses who testified about the investigation and evidence, Los Angeles Police Department (LAPD) gang officer, Matthew Zeigler testified about appellant's gang involvement.  He testified that he had approximately five contacts with appellant in the months prior to the shooting and that appellant had identified himself as a gang member.

The jury found appellant guilty of first-degree murder and found all the special allegations true.   Appellant was sentenced and this appeal followed.

## *DISCUSSION*

**The Trial Court Did Not Err When It Denied Appellant's Motion For A Mistrial**

Before this court, appellant argues that trial court erred and violated his due process rights by denying his motion for a mistrial after Officer Zeigler testified that appellant had been "detained" by police in June 2004.

### A.    Background

During the trial it was anticipated that gang Officer Zeigler would testify that appellant had admitted his gang membership during one of their encounters on the street prior to the crime.  Appellant therefore asked the court to conduct a hearing pursuant to

---

[8]    Appellant was arrested driving his green SUV.  In the vehicle the police found a backpack containing a loaded, 9-millimeter semi-automatic pistol, a separate magazine with 9-millimeter ammunition, and five "live rounds" of .38-caliber ammunition.  Officers also searched three units in an apartment building on 7th Street where appellant and his relatives lived.  In one of the units officers found a black jacket with green letters spelling "Mexico" across the front.  The jacket matched the description of the jacket that the shooter was seen wearing that evening.

Evidence Code section 402 to determine whether the statements attributed to appellant about his gang involvement were volunteered during a consensual contact or whether appellant was in custody at the time and should have been given an admonition pursuant to *Miranda v. Arizona* (1969) 384 U.S. 436 (*Miranda*). During the Evidence Code section 402 hearing outside the presence of the jury, Officer Zeigler testified that he contacted appellant approximately five times. When describing one of the contacts in June 2004, Officer Zeigler stated: "I'm not sure if – we'd talked about not talking about the arrest in front of the jury. Is it okay in this environment?" The court responded, "In this environment, yes." Officer Zeigler then described that appellant had been arrested in June 2004 for violating a gang injunction.

Thereafter during his testimony before the jury Officer Zeigler described his "contacts" with appellant. He related the details of a contact in June 2004 as follows:

"Q          Any other contacts with [appellant]?

"A [Zeigler:] One other contact.

"Q          And when was that?

"A [Zeigler:] That was in June 2004.

"Q          And where did that take place?

"A [Zeigler:] In the area of 7th and Berendo.

"Q          And how did that come about? How did you come across him?

"A [Zeigler:] There was a radio call.

"Q          And what did you do?

"A [Zeigler:] We responded to the radio call. Two other officers responded first. And [appellant] was detained.

"Q          That was a radio call for what?

6

"A [Zeigler:] It was – we call it a 415 gang fight where there was 15 people involved in the alley.

"Q        When you arrived, how many people did you see in the alley?

"A [Zeigler:] I arrived late.  Officers Hernandez and Hernandez were the first ones there.  So they told me what had occurred when they got there.

"Q        When you arrived, you saw [appellant] there?

"A [Zeigler:] [Appellant] was detained with another individual.

"Q        Did you ever determine what was happening in that incident?

"A [Zeigler:] Yes.

"[Appellant's trial counsel]:  Your Honor, I have to object and ask to approach again.

"The Court:   Well, is there a relevance objection?

"[Appellant's trial counsel]: Yes.

"The Court:   The objection is sustained for now.  If counsel wants to be heard at sidebar, we can do that.  Proceed."  At sidebar, appellant's trial counsel stated: "First of all, my prior objection that I wanted to approach – I had this discussion that we weren't going into the arrest, and somehow we got into it.  So first I will make a motion for a mistrial based on that and submit on that."  Appellant's trial counsel then complained about the subsequent series of questions, specifically objecting because it involved matters previously undisclosed to the defense.  The prosecutor's response focused exclusively on the second objection and did not respond to the motion for the mistrial. The court denied the motion for a mistrial.

B.     **Analysis of Appellant's Contention**

"'A motion for mistrial is directed to the sound discretion of the trial court [and] should be granted if the court is apprised of prejudice [it deems] incurable by admonition or instruction.'" (*People v. Cox* (2003) 30 Cal.4th 916, 953, overruled on other grounds

in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 986.)

A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice. (See *People v. Wharton* (1991) 53 Cal.3d 522, 565 [motion for mistrial properly was denied because court's admonition and witness's later testimony under cross-examination dispelled prejudice].) But the court does not presume that knowledge that a defendant previously has been convicted and is being retried is incurably prejudicial. (See *People v. Anderson* (1990) 52 Cal.3d 453, 468 [claim that trial court improperly disclosed to jury that the defendant previously had been sentenced to death for the same offense was waived by counsel's tactical failure to object, and was not prejudicial].)

Thus, "[w]hether in a given case the erroneous admission of [evidence of the defendant's prior criminality] warrants granting a mistrial or whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581, citing *People v. McLain* (1988) 46 Cal.3d 97, 113.) A trial court must grant a motion for mistrial when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

Thus, when the issue is whether the witness's comment was so incurably prejudicial that a new trial was required, our standard of review is deferential. (*People v. Harris*, *supra*, 22 Cal.App.4th at p. 1581.) It is "only in the exceptional case" however, that the trial court's admonition will not cure the effect of improper prejudicial evidence. (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.)

Appellant argues that Officer Zeigler violated the court's order to not refer to appellant's "arrest," when he mentioned that appellant had been detained; that the

8

reference could not have been cured by any admonition; and that it was prejudicial in this case.

We are not convinced the trial court abused its broad discretion when it denied the motion for a mistrial. Preliminarily, Officer Zeigler's references to appellant being "detained" did not violate any *express* order of the court. Although there was apparently some off-the-record discussion about not referring to appellant's prior arrests, there is nothing in the record before us to indicate that the court "ordered" Officer Zeigler to not make reference to them.

In addition, the references were brief and volunteered; they were not directly responsive to the questions posed. The prosecutor's first question: "And what did you do?" did not ask whether appellant had been arrested or detained. Instead, Officer Zeigler responded to the question, saying "We responded to the radio call," and then Officer Zeigler volunteered: "Two other officers responded first. And [appellant] was detained." Likewise the second reference to appellant being detained was also unprompted after the prosecutor asked: "When you arrived you saw [appellant] there?" to which Officer Zeigler offered: "[Appellant] was detained with another individual." The prosecutor's questions were broad and not inherently likely to elicit a reference to appellant's detention.

Moreover, the reference to being "detained" was also ambiguous and in relative terms fairly innocuous. In the parlance of criminal law, being "detained" is not the same as being "arrested." As recognized in the fourth amendment law and jurisprudence relating to *Miranda* warnings, a detention is something short of arrest—it refers to being confined and held during an investigatory stop. Here Officer Zeigler referred to appellant being "detained" in the context of appellant's prior consensual "contacts" with gang officers. And in the universe of possible references to prior criminality—it is relatively mild. It does not suggest that appellant was convicted, or served time in prison for any crime. (See *People v. Bolden* (2002) 29 Cal.4th 515, 554-555 [where police officer volunteered that he located defendant through a parole office, no error in denying mistrial

9

where reference was brief and no reasonable juror would infer that defendant had served a prior prison term]; *People v. Valdez* (2004) 32 Cal.4th 73, 124-125 [where witness volunteered that defendant had been at Chino prison, no error in denying mistrial because reference was isolated and prejudice curable by instruction]; see also *People v. Fagalilo* (1981) 123 Cal.App.3d 524, 532 [hold that officer's reference to investigating "other crimes" did not mean that appellant had been suspected of other crimes and any implication could have been dispelled by a request for an admonition].) Officer Zeigler also had testified about his consensual, cooperative contacts with gang members, including appellant. Thus, in our view, no reasonable juror would automatically infer that appellant had been arrested, charged or convicted of a crime based on Officer Zeigler's reference to appellant being detained by police.

Finally, in this case, the jury's brief exposure to reference to appellant's detention could have been curable by a timely admonition to disregard it. Indeed, the court sustained a relevance objection to the question that followed the last reference, and the trial court subsequently instructed the jury to ignore the evidence where objections had been sustained. We presume the jury heeded that instruction and disregarded the irrelevant evidence. (See *People v. Burgener* (2003) 29 Cal.4th 833, 874 ["We do not agree the isolated references to an escape, immediately followed by an admonition to disregard them, mandated a mistrial. In the absence of evidence to the contrary, we presume the jury heeded the admonition."].) Because there was no pattern of egregious conduct, but instead two brief references, volunteered by a witness that could have been cured by the court's admonishment, appellant was not denied a fair trial, and denial of his mistrial motion was not an abuse of discretion.

In any event, even if we were to conclude the court erred, we would also conclude any such error was harmless in light of the evidence of appellant's guilt. Two eyewitnesses—Ochoa and Aaron—identified appellant as the shooter. The women identified appellant from his distinctive appearance and clothing. A third witness saw a person matching appellant's description walk quickly into appellant's apartment building

10

immediately after the shots were fired. Diaz, a fellow gang member, described how shortly after the murder, appellant approached him, and admitted committing the murder. Appellant described the crime to Diaz using details that were consistent with the eyewitnesses' version of events. Furthermore, when appellant was arrested, the police found ammunition of the type used in the crime, and located clothing at appellant's apartment that matched that worn by the shooter.

In view of this evidence, it is not reasonably probable that the jury would have reached a more favorable result in the absence of any mention of the fact that appellant had been detained by police on one occasion prior to the crime.

## *DISPOSITION*

The judgment is affirmed.


**WOODS, Acting P. J.**

**We concur:**



**ZELON, J.**                                        **SEGAL, J.***


---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11