Filed 9/30/14  P. v. Castro CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARIA CARACHURE CASTRO,<br><br>    Defendant and Appellant. | G049023<br><br>(Super. Ct. No. 13CF0003)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, M. Marc Kelly, Judge.  Affirmed.

Marianne Harguindeguy Cox, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Maria Carachure Castro of first degree residential burglary. Castro contends the prosecutor engaged in prejudicial misconduct during closing argument by improperly vouching for the credibility of witnesses and impugning defense counsel's motives and integrity. For the reasons expressed below, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of December 31, 2012, Edward Murashie and his fiancée Linda Grant arrived at the Santa Ana house they purchased in August 2012. Murashie and Grant had hired workers to remodel the residence, which entailed restoring the hardwood floors, tearing out the garage, redoing the driveway, and constructing brick and tile work in the courtyard. Grant had moved furniture and personal effects into the home in October 2012. The couple kept clothes and furniture in the home and the utilities were on except when contractors turned the electricity off. According to Grant, she kept most of the property in boxes because of construction dust. Grant slept at the home four to five nights a week after October, and Murashie also spent nights there.

The couple pulled into the driveway and noticed an older model van parked on the street directly in front of the house. The rear passenger side door was open and Murashie saw various items inside. Castro sat in the driver's seat. As Murashie walked down his driveway, the front door of the house opened, and he spotted someone standing in the doorway. The person, later identified as Castro's 14-year-old son F., wore a hoodie and gloves, and carried a small flashlight. Murashie approached F., but F. ran around him to the van, where he closed the door and then ran up the street and disappeared.

2

Murashie chased F. as far as the van, but believing the driver was about to leave with his property, he opened the passenger door, jumped in, and grabbed Castro's "hand which [was] on the keys to shut the car off." He also shifted the transmission back to park. As Murashie tussled with Castro, F. returned to intervene, pulling on Murashie's waist. A neighbor pulled the young man away from Murashie. Murashie responded he wanted Castro out of the car "so we can assess what's going on here." F. grabbed Murashie's dress shirts and tossed them at him, exclaiming, "Here's your stuff." Murashie identified other items stolen from his house in the van, including more clothing, his letterman jacket, a new area rug with tags attached, desert rose china dishware, and an electrostatic ball. Other items had been placed by the front door. Moving boxes had been torn open and packing material was scattered around. Wood had been chipped or torn away from the lock area of the front door.

According to Officer David Garcia, Murashie told him Grant had moved out of her apartment and was living at both the Santa Ana house and Murashie's Fullerton apartment. Garcia testified at the preliminary hearing Murashie told him Grant or he had slept two times or a "couple nights" at the house, a fact Garcia did not include in his original police report. Garcia phoned Murashie after the preliminary hearing and confirmed that information, and prepared a supplemental police report. Castro told Garcia at the scene she and F. did not do anything wrong, although Garcia did not include this statement in either of his police reports.

Garcia interviewed Castro at the police station. Castro stated she and her son were collecting recyclables. She had parked near Flower and 19th Streets, a few blocks south of Murashie's and Grant's house. F. told her the house appeared empty or under construction. She asked him to make sure no one was home. F. left to check, and

Castro parked in front of the residence. F. came out with a bundle of long-sleeved shirts, placed them in the van, and announced there were "neat things" inside the home. Castro accompanied F. into the residence. She took a glass dish set, and told F. to carry an area rug and place it in the van. Castro got back into the van while F. reentered the house. The confrontation with Murashie occurred shortly afterward. Castro admitted it was a "dumb decision" to enter into the home and she apologized.

Castro told a different story on the witness stand. She claimed F. told her he found the shirts in the trash outside the house and there were many other items outside on the street. She and F. drove the short distance to the house. She walked up Flower Street with her cart to collect items she believed were recyclables. She returned to the van but did not see F. She waited about 15-20 minutes, then grew impatient and began honking the horn. She saw a man approach the van, so she unlocked the doors and started the engine. Murashie got in, sat down and yelled "my house" twice in English, which she does not understand, and he grabbed her keys and exited the van. She did not know F. had gone into the house and did not see the other stolen items in the van until she got out of the vehicle. Castro denied saying anything to the officer at the scene, but at some point before they arrived at the police station she told him she "didn't do anything." In the interview room, the officer asked if she entered the house. She said "no" and that she "never did anything wrong." Garcia warned her, "[F.] had already told him everything." She asked what would happen with F., and the officer replied it all depended on whether she told the truth. She interpreted this to mean the officer wanted her to admit going into the house. Frightened and intimidated, she acknowledged entering the residence, believing this would make it easier for her son.

4

Following a trial in August 2013, the jury convicted Castro of first degree residential burglary. In September 2013, the trial court suspended imposition of judgment and placed Castro on probation on various terms and conditions, including a one-year jail term.

II

DISCUSSION

*No Prosecutorial Misconduct*

Castro contends the prosecutor engaged in prejudicial misconduct during closing argument by improperly vouching for the credibility of witnesses and impugning defense counsel's motives and integrity.

During closing argument, the prosecutor stated defense counsel had "sort of made a big deal" about Garcia's report by asserting it was "shoddy" and Garcia did not "take notes of every single person" he "talked to." She continued "there was some talk from [defense counsel] about . . . why didn't you talk to this witness, the neighbor [Martin, who Murashie testified pulled F. away during the struggle with Castro]? He [Garcia] sat up there, took an oath to tell the truth, and told all of you . . . I talked to everyone. I figured out who was important, who had actually seen what had happened, and I wrote that in my report. [¶] [Garcia] said the [neighbor] saw the tail-end of what happened" and "didn't have enough information for him to consider it valid to put in a report. It was an honest answer. And does it affect anything about this case? No, it doesn't. [¶] You'll hear the defense attorney probably want to make a big deal about that, but both sides have the power of subpoena. If there's someone you want – you think you should have heard from, either side can call witnesses."

The prosecutor then noted Garcia was a native Spanish speaker who could communicate with Castro. She "told [Garcia] the whole story. And, again, he wrote a detailed report about his conversation with her. [¶] You'll probably hear defense counsel say, oh, well, he didn't record it so we can't trust it. Well, Officer Garcia, this is his living. He has to come in here on any case we call him in on and testify before you. Ask yourselves would he risk his reputation, his livelihood . . . ."

Defense counsel objected, "Improper vouching." The court overruled the objection, declaring, "It's absolutely proper commentary." The prosecutor continued, "Would he risk his livelihood, his career, his retirement, everything about his life to come and lie to you, to make up a story about a woman he met one night that he arrested for a crime that she had committed? He has no axe to grind. He doesn't know her. He wrote down the truth. He did his job."

Later, the prosecutor made a similar argument: "Ms. Castro. What did she tell the police that night? If you believe Officer Garcia wouldn't put his career and livelihood in jeopardy, come in here and completely lie and fabricate a story about a woman he's never met . . . ." Defense counsel again objected on grounds of "improper vouching." The court again overruled the objection.

After recounting Garcia's testimony concerning Castro's statement, the prosecutor stated, "Well, if Officer Garcia is such an awful person and lying and a corrupt officer, why would he add in the fact that, oh, she actually said she – she apologized, she felt bad, it was a dumb decision. Why make her sound like a nice, remorseful person? It's because he's telling the truth." Defense counsel did not object.

The prosecutor concluded closing argument by noting the only evidence pointing to Castro's innocence was her "self-serving testimony," and she asked the jury

"to consider the evidence you heard from the witness stand. And I challenge [defense counsel] to get up and not tell stories or anecdotes and just stick to the evidence that was presented. Because that's what's important here, what you heard from three witnesses and what happened that night." Defense counsel did not object.

Defense counsel in closing argument described Castro's purported admissions as a "highly suspect, questionable confession that was eventually given by [Castro] during aggressive police interrogation after her initial denials of any wrongdoing were simply disregarded by the police and not even mentioned in any police report." Counsel denied suggesting Garcia was corrupt, but argued "[h]e made mistakes. His memory was poor about many things," and he assumed Castro's guilt based on "perceptions. To a hammer, everything looks like a nail. [¶] The police are in the business of finding criminals, not innocent people." Defense counsel referred to Castro's "so-called confession," arguing it was not recorded and asked why "Officer Garcia made the conscious decision to not record that interrogation[.]" Counsel emphasized Garcia's report did not include Castro's initial denial of wrongdoing, failed to preserve his interview notes, and "conveniently destroyed those notes and any reference to initial denials of guilt." Counsel also questioned the photographs showing clothes on the front passenger seat: "How do we know when those clothes . . . were placed there? Were they moved before they were photographed?" Defense counsel argued Garcia's credibility was suspect: "Do you really believe that anyone ever told [Garcia] that somebody had slept in that home" as "he testified [] at the preliminary hearing . . . when he was under oath, even though he never recorded that important fact anywhere in his report." Defense counsel admonished the jury that if "somebody lied about something that you deem is important, the law tells you you should consider not believing anything that they said."

Counsel also questioned the prosecutor's claim that Garcia had no motive to lie, arguing "[h]uman beings have motives to embellish things . . . [and] even sometimes lie" and police officers do lie "often[.] We read about it in newspapers. We hear about it on television." Counsel listed various examples of police corruption drawn from the news. Counsel also stated "where is the evidence that if [Garcia] admitted to any of these things, that his career is going to be gone? We don't know that."

The prosecutor rebutted defense counsel's claim that he had not called "the police corrupt, just incompetent. Well, let's think about what he's accused Officer Garcia of doing. If that's not being accused of corruption, I'm not sure what it is. [¶] He's saying Officer Garcia falsified his police report. A crime. He's saying Officer Garcia came in under penalty of perjury and lied to you." Defense counsel objected this misstated his arguments, but the court overruled him. The prosecutor continued, "A serious crime. He's saying Officer Garcia did a really shoddy investigation. Can't be trusted. Didn't record anything so we can't take anything he said to be the truth. . . ." She noted defense counsel had suggested photographs had "been tampered with. How do we know the clothes were there before the police might have moved them and took a picture? It's getting a little bit ridiculous at that point."

The prosecutor turned to defense counsel's claim Castro was the victim of aggressive interrogation. "He would have you believe she was strung up by her pinkie toes and not given water, tortured, I don't know. She was in a room speaking with a police officer who spoke her language. I wouldn't necessarily agree with the phrase aggressively interrogated, but you can be the judge of that." The prosecutor remarked the "majority of the defense relies on the fact that you can't trust Officer Garcia. Corrupt, dishonest, whatever you want to call it, you can't trust him." The prosecutor concluded,

8

"Take Officer Garcia out of it. Disregard everything he said if you want to. And then think about what's left. It comes down to [Murashie and Grant], their credibility and their version of what happened that night versus the story of the person sitting there on trial." The prosecutor then recounted some of their testimony, and stated "It's that versus a self-serving statement of I didn't go in the house or my son did it. I didn't know what was going on. It's enough. If you believe the victims and what they saw that night, that's enough. They were credible. They were honest. They had no reason to lie. They remember that night." Defense counsel objected to the prosecutor's last statement as "improper vouching," but the court overruled the objection.

"A prosecutor may fairly comment on and argue any reasonable inferences from the evidence. [Citation.] Comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible. [Citation.] However, a prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' [Citations.] [¶] A prosecutor may not suggest the existence of "'facts'" outside of the record by arguing matters not in evidence. [Citation.] Nor may a prosecutor suggest that matters outside the record establish the veracity of a witness; however, the prosecutor may assure the jury of a witness's apparent honesty or reliability based on matters in the record. [Citations.] It is also improper for a prosecutor to resort to personal attacks on the integrity of opposing counsel. [Citation.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112-113.)

In *People v. Anderson* (1990) 52 Cal.3d 453 (*Anderson*), "the prosecutor remarked that 'A law enforcement officer is no good as a witness if his credibility is in doubt,' and in essence supported the credibility of the officers testifying in this case by

9

noting that 'a number of them . . . are old, experienced officers.  They've got 15, 20, 22 years of experience on the force.'  The prosecutor expressed her doubt that any of them would 'jeopardize' his reputation by lying on the witness stand 'just to convict one defendant.'  The prosecutor continued by noting that defendant, on the other hand, would only be testifying once, rather than a number of times, that he 'doesn't have anything else to lose,' and 'so what if you do catch him in a few lies?'" (*Id.* at p. 478.)  After noting the general rule a prosecutor may not vouch for the credibility of prosecution witnesses, or refer to evidence outside the record to bolster their credibility, the Supreme Court observed "In the present case, the prosecutor limited her remarks to *facts of record*, namely, the years of experience of the officers involved, and her 'vouching' was clearly based on inferences reasonably drawn therefrom, rather than on her personal belief or knowledge.  [Citation.]  We find no improper prosecutorial vouching here." (*Id.* at p. 479.)

Similarily, in *People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1269, the appellate court found no improper vouching "'so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief."'" (*Id*. at p. 1269.)   The appellate court also found no misconduct when the prosecutor argued "'Why would [detectives] put their career on the line for this case?'" and "'What makes this case so special that these officers would perjure themselves?  What do they have against Mr. – poor Mr. Caldwell?  Nothing. . . . There is no reason for those officers to lie.'" (*Id.* at p. 1270.)

Castro argues "defense counsel never accused [Garcia] of being a corrupt police officer in his questioning.  Rather, he simply attempted to challenge him to what

he remembered, which was a proper method of cross-examination and providing a defense. And even if defense counsel employed strident methods of questioning the officer as to his sloppiness in reporting, this does not justify and make it fair game to vouch for his credibility by means the prosecutor employed."

We disagree. Despite defense counsel's statements to the contrary, his questions and argument at least implied Garcia had intentionally left material out of his police reports, embellished his testimony, and manipulated evidence (the photographs of items in the car) to bolster the case against Castro. Counsel's reference to other police corruption cases was hardly subtle. A police officer who lies or fabricates evidence does place his career at risk. The prosecutor's argument here did not stray beyond what *Anderson* held was permissible.

As for the statements concerning Murashie and Grant, the prosecutor argued, "They were credible. They were honest. They had no reason to lie. They remember that night." The prosecutor may properly comment on the credibility of witnesses based on the witness's testimony, demeanor, and other evidence presented at trial. Here, the prosecutor did not suggest she had any information outside the record that made these witnesses credible, instead relying on their demeanor during their testimony. These statements did not constitute improper vouching. (*People v. Sully* (1991) 53 Cal.3d 1195, 1235 ["Considered in context, almost all of the examples cited amounted to argument from facts in the record directed to the credibility of witnesses, not the personal statement of the prosecutor vouching for their credibility"].)

Castro also complains "the prosecutor directly attacked his lawyer's honesty and integrity, citing the prosecutor's argument "to consider the evidence you heard from the witness stand. And I challenge [defense counsel] to get up and not tell

11

stories or anecdotes and just stick to the evidence that was presented. Because that's what's important here, what you heard." Castro failed to object to this statement and accordingly cannot now raise a claim of misconduct on appeal. (*Anderson*, *supra*, 52 Cal.3d at p. 478.) In any event, the prosecutor's statement did not constitute a personal attack on defense counsel or imply defense counsel had an improper motive or lacked integrity. She simply urged the jury to focus on the evidence rather than counsel's illustrative personal and historical examples. (See *People v. Taylor* (2001) 26 Cal.4th 1155, 1166-1167 [prosecutor does not demean defense counsel's integrity by commenting on defense attorney techniques to """try to draw some speculation, try to get [jury] to buy something""].)

Castro also argues the prosecutor "attack[ed] the integrity of defense counsel . . . by misstating that defense counsel had accused the officer of a crime" or corruption. As noted above, counsel's argument did carry this implication concerning Garcia. The prosecutor's remark about what she perceived as the unwarranted maligning of Garcia did not constitute an attack on *counsel's* honesty, morals or character.

Finally, the prosecutor's rebuttal argument disputing defense counsel's characterization of Castro's interrogation did not constitute misconduct. We reject Castro's claim the prosecutor attacked "defense counsel's motives and integrity" when she characterized defense counsel's argument as urging the jury to "believe [Castro] was strung up by her pinkie toes and not given water, tortured I don't know." The prosecutor merely took issue with defense counsel's characterization of "the highly suspect, questionable confession that was eventually given by [Castro] during aggressive police interrogation after her initial denials of any wrongdoing were simply disregarded by the

12

police and not even mentioned in any police report." No basis exists to overturn the judgment.

## III

### DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.