Filed 6/23/15  P. v. Gabrielson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>         v.<br><br>MICHAEL GABRIELSON and CORY BRIAN SULLIVAN,<br><br>    Defendants and Appellants. | G049572<br><br>(Super. Ct. No. 13HF0379 )<br><br>O P I N I O N |

Appeal from a judgments of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed in part and remanded with directions.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant Michael Gabrielson.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Cory Brian Sullivan.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Meagan J. Beale and Michael Mogan, Deputy Attorneys General, for Plaintiff and Respondent.

Michael Gabrielson and Cory Brian Sullivan appeal from the judgments entered following their convictions on counts alleging first degree robbery (Penal Code, §§ 211, 212.5, subd. (a), 213, subd. (a)(1)(A); all further statutory references are to this code); first degree burglary with the intent to commit larceny (§§ 459, 460, subd.(a)); and false imprisonment by means of violence, menace, fraud or deceit (§§ 236, 237, subd. (a).) Gabrielson admitted to three prison priors, and Sullivan admitted to one prior strike for purposes of section 667, subdivisions (d) and (e)(1), and three other prison priors.

The defendants were sentenced separately. The trial court sentenced Gabrielson to the midterm of six years on the robbery count, and later sentenced Sullivan to the low term of three years on the same count, but doubled it because of his prior strike. The court imposed similar terms for both defendants on the burglary count, but stayed those terms based on section 654. And on the false imprisonment count, the court imposed a two-year term on Gabrielson, and later imposed a term of one year and four months on Sullivan, again doubled. However, the court ordered both of those false imprisonment sentences to run concurrently with the terms imposed on each defendant for the robbery. After the court imposed additional terms based on prison priors and Sullivan's prior strike, Gabrielson's total sentence was seven years and Sullivan's total sentence was 13 years.

Gabrielson argues the court abused its discretion by sentencing him to the midterm on each of the counts, when it sentenced Sullivan – whose culpability was allegedly the same or higher – to only the low term. And joined by Sullivan, he also argues the court erred by imposing sentence on the false imprisonment count, which they believe should also have been stayed under section 654.

Both defendants also assert the prosecutor engaged in prejudicial misconduct by (1) improperly "vouching" for the credibility of her main witness, and (2) implying the defendants were withholding evidence from the jury. They also claim that to the extent those assertions were waived by a failure to object in the trial court, that

2

failure amounted to ineffective assistance of counsel.  Both defendants have filed petitions for habeas corpus, offering additional evidence in support of this claim.

We conclude defendants' claim of sentencing error on the false imprisonment count has merit, and we consequently remand the case to the trial court with directions to prepare new sentencing abstracts reflecting that the terms imposed on both defendants for false imprisonment are stayed pursuant to section 654.  In all other respects, the judgments are affirmed.

Gabrielson's contention that his sentence is arbitrary and unfair, *as compared to Sullivan's*, is not cognizable on appeal.  An appellant can argue that his sentence is grossly disproportionate to his own culpability for the crime of which he was convicted, that it otherwise qualifies as cruel or unusual punishment, or that the court misapplied the sentencing statutes to his case; but California law does not allow a claim of sentencing error based solely on a review of how appellant's sentence compares to one imposed on someone else.

And defendants' claims of prosecutorial misconduct fail because the evidence does not support their contention the prosecutor's assertion that her witness "was very credible" amounted to improper vouching, or that her expression of disappointment that the jury would not be allowed to take the transcript of a lengthy recorded interview into the jury room implied defendants were withholding evidence.  In context, it is clear the prosecutor's credibility argument was based on an evaluation of the evidence admitted in the case, and that her lament about the excluded transcript reflected only a recognition that it would be harder for the jury to focus on what she considered the important parts of the recorded interview without having the transcript to use as a reference.  There was no implication that the transcript – which jurors had already been allowed to review as they listened to the recorded interview during trial – contained *different evidence*.

3

Because we have concluded there is no merit in defendants' claims of prosecutorial misconduct – and thus none in their related claims of ineffective assistance of counsel – we need not consider those issues further in the context of petitions for habeas corpus, and we issue separate orders denying those petitions.

FACTS

In November 2012, 29-year-old Sean Causey lived at his mother's home in Coto de Caza. Causey had a history of drug addiction, including heroin and methamphetamine, and had in the past stolen from his parents to support his drug habit. As a consequence, his mother stored all her valuables – including firearms – in a locked safe located in one of two locked closets in her bedroom. She kept the only keys.

Causey's mother went away for the weekend, leaving him alone in the house. He was instructed to have no visitors. However, Causey met Simone Timatyos through another friend, and agreed to let her stay at his mother's house for the night because she had nowhere else to go.

Timatyos stayed that first night without incident, and left on Saturday morning. Later that day, however, Causey's friend called him to ask if Timatyos could spend the night at his house again, and he agreed. Timatyos arrived back at the house with her boyfriend, defendant Gabrielson. She mentioned to Causey that Gabrielson was a member of PENI, which Causey knew was a white supremacist gang, but Causey was not particularly concerned about that. He let them both into the house, and after he gave the two of them a tour of the house, they all did drugs together, including heroin and methamphetamine.

At some point in the evening, the three of them left in Causey's car to get more drugs, which Gabrielson paid for. They returned to the house and continued to do more drugs until Sunday.

Sometime around sunset on Sunday, defendant Sullivan arrived, ostensibly to pick up Timatyos. Causey and Timatyos went to the front gates of Coto de Caza to escort him in. Causey thought Sullivan would be staying for only a short time. Just before Sullivan's arrival, Causey received a delivery of more heroin to the house, also paid for by Gabrielson – albeit using counterfeit money.

After Sullivan's arrival, more drugs were consumed in Causey's room. Causey injected heroin, and just as Causey was "nodding out" from its effect – meaning that although he was standing, he was "going in and out of sleep" – Sullivan hit him in the face with a Diet Coke bottle. Causey and Sullivan then wrestled, ending up on a bed with Gabrielson holding Causey down. By that point, Causey was no longer "nodding out." As he explained, "I feel I had sobered up because of what was happening." Causey was then escorted through the house, ending up in the shower stall in his mother's bedroom, where he was guarded by Timatyos while defendants "were going through the house, looking for things to steal." Causey testified he had been "looking for a phone" while being walked through the house, but noticed the phones had been disconnected.

While Causey was being guarded in the shower, defendants managed to pry open the doors of the locked closets, and started bagging up items of value, including a video camera, ammunition, and a bullet proof vest. Causey was scared that if he tried to leave the shower, someone would harm him or try to restrain him further. After defendants had finished in one of the closets, Causey was moved from the shower stall into the closet.

Defendants had removed tools from the garage, in an apparent attempt to facilitate opening the locked safe. They were unsuccessful, however.

At some point on Sunday night, and again on Monday, Causey was ordered to call his mother, to confirm when she would be arriving home. She informed him it would be Monday evening. Causey was too scared to tip her off about what was going on.

5

Defendants and Timatyos stayed at the house until Monday afternoon, making food and swimming in the pool. Causey stayed in his room. Ultimately they left in Sullivan's pickup truck, after deciding to leave behind the majority of items they had stolen from the house. They told Causey they would leave the items if he agreed not to call the police.

Causey did not call the police. Instead, he testified that he called his mother and told her what had happened. He then cleaned the house somewhat, replacing items temporarily removed by defendants, and attempting to remove all evidence of drug paraphernalia. By the time Causey's mother arrived home, he had left, driving away in her car to visit a friend. He and his friend then drove around for awhile, finally returning to Causey's house. When Causey saw that police officers were at the house, he advised his friend – who had drugs in his possession – to get out of the car and promised to call him later.

When Causey went in the house, he told the police what had happened. His mother was quite upset with him and did not initially believe his story.

According to Causey's mother, he did not tell her what had happened when he telephoned her shortly after defendants and Timatyos had left, as he claimed. She testified that although he did call her, and sounded very upset – "scared, lonesome, crying, whining" – he did not tell her anything about the robbery. Instead, she learned of it only when she arrived home to find both Causey and her car gone, and saw that her closets had been broken into. She was frightened and called the police.

Causey was subsequently arrested for a probation violation, and it was not until a couple of months later that sheriff's department investigators contacted him in jail, and questioned him about the events that had taken place during that weekend.

In contrast to Causey's story, defendants portrayed the weekend as involving the full consent of Causey. They asserted the most plausible interpretation of the evidence was that Causey had been an active participant in the decision to break into

6

his mother's closets (as he had admittedly done previously) and in the effort to gain access to the safe. In their closing arguments, defendants attacked Causey's credibility, highlighting his long history of drug addiction and his prior criminal history. They argued Causey's version of events was not credible, and pointed out he had a significant motivation to lie.

In her rebuttal, the prosecutor responded to this portrayal of Causey stating: "[defense counsel's] characterization that [Causey] is a scoundrel and a liar . . . was pretty severe, and to say this was nothing but a party weekend that ended in the taking of some trinkets is pretty offensive." She then said, "I will say this. Sean Causey was very, very credible. I guess the moral of the story if you want to go with the defense interpretation is that you should never believe anything that someone who uses drugs or has an addiction problem says. I mean, let's commit crimes against those people because they are never credible."

The prosecutor went on to explain why the testimony Causey gave was credible, pointing out that Causey would have no motive to break into the closets, since Gabrielson had been able to pay for the drugs Causey wanted with counterfeit cash. Her theory was that the robbery was not motivated by the desire to obtain drugs (Causey's only potential motivation), but was instead primarily intended by defendants as a means of obtaining the firearms which they knew were in the locked closets, for use by PENI, their White supremacist gang. She also pointed out Causey was at all times aware that the valuables in the closets were kept inside a locked safe, which he knew he would have no means of opening. Hence, Causey knew there was nothing significant to be gained by breaking into the closets. And she also noted it made no sense for Causey to be put in the shower under guard (which Timatyos confirmed in her testimony had occurred), if he had been a willing participant in the robbery.

Finally, the prosecutor returned to defendants' contention Causey was a "scoundrel," arguing "I don't think you are going to find that Sean is a scoundrel and a

7

liar and incredible. If he was making up this story, why would he admit to his own drug use? Why would he admit that he was nodding off while he was in his bedroom and injecting himself with heroin? Why would he subject himself to the embarrassment of telling anybody that he was using heroin and shooting up? [¶] Why would he admit that Mickey Gabrielson was nice to him while this was happening before Sullivan got there? . . . [¶] If he is making it up, he would make it more elaborate. . . . Instead, he is telling you the truth."

The jury returned guilty verdicts against both Gabrielson and Sullivan on the counts of robbery, burglary and false imprisonment, although it acquitted them on counts alleging they had engaged in those crimes for the benefit of their gang, PENI.

The trial court sentenced Gabrielson first, in a morning court session, and then sentenced Sullivan in a separate session in the afternoon of the same day. The court deemed the residential robbery to be the principal term for both defendants, sentencing Gabrielson to the midterm sentence of six years on that count, and later sentencing Sullivan to the low term of three years, which was then doubled because of his prior strike. On the burglary count, the court also imposed the midterm of six years on Gabrielson, and the low term of three years on Sullivan, which was again doubled because of his prior strike. However, the court stayed the sentences for both defendants on the burglary count, based on section 654. On the false imprisonment count, the court imposed a two-year term on Gabrielson, and a term of one year and four months on Sullivan, again doubled. However, the court ordered both of those false imprisonment sentences to run concurrently with the six-year terms imposed on each defendant for the robbery.

The court sentenced Gabrielson to an additional one-year term for each of his prison priors, but ordered two of those to run concurrently, for a total sentence of seven years. The court imposed an additional five-year term on Sullivan for his prior

8

strike, plus one additional year for two prison priors (it struck the third), for a total sentence of 13 years.

## 1. Gabrielson's Assertion of Sentencing Error

### 1.1 Proportionality Review

Gabrielson first asserts the court abused its discretion by "arbitrarily" sentencing him to the middle term on the robbery count, while sentencing his codefendant, Sullivan, to the lower term on that same count. He claims the court relied on "the same sentencing factors" in sentencing both defendants, which "demonstrates the capriciousness of its decision to sentence [him] to the midterm on the principal count and Sullivan to the low[]term."

As a general rule, sentencing errors are waived if not raised in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 353 ["the waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"].) However, Gabrielson argues there could be no waiver of his comparative challenge based on Sullivan's relatively lenient sentence because Sullivan had not yet been sentenced at the time the court imposed Gabrielson's sentence. The point is moot because the law does not entitle Gabrielson to challenge his sentence based on how it compares to the sentence meted out to his codefendant.

The concept Gabrielson invokes in support of his argument is ""'"intracase proportionality review."'"" (See *People v. Debose* (2014) 59 Cal.4th 177, 212 (*Debose*).) However, as explained in *People v. Mincey* (1992) 2 Cal.4th 408, 476 (*Mincey)*, that concept (1) applies only in death penalty cases, and (2) does not permit a defendant to *compare his sentence* with that of a codefendant. "Evidence of the disposition of a codefendant's case . . . is not relevant to the decision at the penalty phase, which is based on the character and record of the *individual* defendant and the circumstances of the offense." (*Id*. at p. 476.)

9

In fact, the defendant in *Debose* – who was contesting the imposition of a death penalty – tried to make such a comparison, and found that effort resoundingly rejected by the Supreme Court: "Defendant contends that his death sentence is inconsistent with, and disproportionate to, the sentences of codefendants Flagg and Higgins, because they each received sentences of life without the possibility of parole despite having, according to defendant, 'far worse aggravating factors' than he had. As a result, he argued, his death sentence violated the Eighth and Fourteenth Amendments to the federal Constitution. Not so. 'As we have explained, "[p]roperly understood, intracase proportionality review is 'an examination of whether [a] defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others.'"'" (*Debose, supra*, 59 Cal.4th at p. 212.)

Interestingly, Gabrielson acknowledges that our courts have "rejected the notion of . . . intracase proportionality review in sentencing except when the sentence is grossly disproportionate to the crime," and that such review is not required in cases "not involving [a] death sentence." But he nonetheless argues that in *Mincey,* the Supreme Court "left room for courts to include a comparison of codefendants in its sentencing analysis with regard to culpability and involvement, which in this case should have led to a different result." Gabrielson has misconstrued *Mincey.*

First, nothing in *Mincey* expands intracase proportionality review beyond the realm of death penalty cases. And second, the purported "room" allowed by *Mincey* is found in its statement that evidence of a "codefendant's complicity and involvement in the offense" could be relevant in assessing *whether the imposition of the death penalty was "disproportionate to [appellant's] individual culpability.*" (*Mincey, supra*, 2 Cal.4th at p. 476, italics added.) So the relevant proportionality review, even if applicable, remains focused on the relationship between the appellant's *individual culpability* and *the sentence imposed upon him*. "Although such proportionality analysis takes into account the defendant's relative responsibility for the crime as compared to others who were

10

involved, the disposition of codefendants' cases is not part of the analysis." (*People v. Ledesma* (2006) 39 Cal.4th 641, 744.)

Nor can we "reconsider [the rule] prohibit[ing] the examination of a codefendant's disposition," as Gabrielson urges. The rule has been imposed by our Supreme Court, and any argument that it should be reconsidered must be directed there.

Because Gabrielson's contention that the court abused its discretion was based entirely on a comparison between the midterm sentence imposed on him, and the low term sentence imposed on Sullivan, the issue is not cognizable on appeal.

### 1.2 Stay of Sentence for False Imprisonment Under Section 654

Gabrielson, joined by Sullivan, also contends the court erred when it failed to stay the term imposed on the false imprisonment count. He argues that because the evidence demonstrates Causey's imprisonment was carried out solely for the purpose of facilitating the robbery, only one penalty could be imposed for both crimes under section 654. "[S]ection 654 prohibits '[p]unishment for two offenses arising from the same act . . . .' [Citation.] 'Insofar as only a single act is charged as the basis for the conviction . . ., the defendant can be punished only once.'" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

This issue is reviewable on appeal even if not raised in the trial court. "[T]he 'unauthorized sentence' concept constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal" and "[i]t is well settled . . . that the court . . . imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654." (*People v. Scott, supra,* 9 Cal.4th at p. 354 & fn. 17.)

On the merits, the Attorney General concedes that "section 654 bars multiple punishments for separate offenses arising out of a single occurrence if the defendant had a single objective," but argues that because the trial court chose to impose

11

the separate sentence for false imprisonment, we must infer it also determined that defendants "had a separate intent and objective when they forced Sean into the shower stall and later into the closet." That is true as far as it goes; the problem is, it does not go very far. The Attorney General's argument is that while it acknowledges a trial court's "implied finding that a defendant had a separate intent and objective for each charged offense will be upheld *if it is supported by substantial evidence*" (italics added), it fails to then identify what "separate intent and objective." The court might have impliedly found prompted Causey's false imprisonment, let alone point out any evidence in the record to support it.

Instead, the Attorney General simply argues that Causey's false imprisonment "was not necessary to the robbery and burglary" because (1) he was "nodding out" on heroin even before Sullivan hit him; (2) he would have been disinclined to call the police, given his own probationary status, and (3) defendants had, in any event, "disabled" the phones. And because falsely imprisoning Causey was not necessary to the robbery, the Attorney General suggests the trial court was free to infer it must have been intended to achieve some *other*, unstated, objective. But this argument is flawed, because the fact that imprisoning Causey may not have proved *necessary* to the robbery is not the same thing as demonstrating these defendants *did not intend* it to facilitate that crime.

In fact, the evidence cited by the Attorney General actually suggests they did. Timatyos testified the phones were disabled during the robbery out of a concern that Causey actually *would* call the police if given the chance. Moreover, the phones were merely *disconnected*, not permanently disabled, so there was a distinct possibility Causey might have been able to use one if left to roam the house alone while the robbery was being carried out. And Causey himself testified he was "looking for a phone" while being escorted through the house to the shower stall, and that his "nodding out" phase of heroin intoxication terminated abruptly when Sullivan hit him with the Diet Coke bottle and they began fighting. As he explained it, "I feel I had sobered up because of what was

12

happening." Thus, despite the Attorney General's claim, it is impossible to conclude that imprisoning Causey was unnecessary as a means of dissuading him from calling the police during the robbery, let alone that defendants themselves would have viewed it that way.

Nor can we discern what alternative objective might have been served by Causey's imprisonment. The Attorney General does refer to it, in conclusory fashion, as a "humiliating act," and we could easily agree that a victim who was forced into a shower stall, and then a closet, by people he had invited into his home, would likely *feel* humiliated. But that fact alone cannot be bootstrapped into a determination that defendants *intended* to humiliate, as a distinct objective.

On this record, we can identify no substantial evidence to support an implied finding that defendants' imprisonment of Causey arose out any "intent and objective" that was separate from the robbery. Consequently, we conclude the trial court erred when it failed to stay their sentences on the false imprisonment count pursuant to section 654.

## 2. *Prosecutorial Misconduct and Ineffective Assistance of Counsel*

Defendants next argue the prosecutor engaged in misconduct by (1) improperly "vouching" for the credibility of Causey, her main witness, and (2) implying defendants were withholding evidence from the jury by refusing to allow the transcript of a recorded interview in the jury room. They also claim that to the extent those assertions were waived by a failure to object in the trial court, that failure amounted to ineffective assistance of counsel.

Generally, the failure to object to such prosecutorial misconduct at the time it occurred waives the contention on appeal. However, because defendants have also asserted that their own counsels' failure to object to this evidence constituted ineffective assistance, we will consider the issue of prosecutorial misconduct in the context of that

13

assertion. (See *People v. Trujeque* (May 27, 2015, S083594) __Cal.4th __ [215 Cal. LEXIS 3895 at pp. 30-31] [considering "a double jeopardy issue on appeal that was technically not cognizable because a meritorious double jeopardy defense relates to a defendant's claim of ineffective assistance of counsel"]; *People v. Scott* (1997) 15 Cal.4th 1188, 1201.)

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.'" (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

"If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'" (*People v. Ledesma, supra*, 39 Cal.4th at p. 746.)

We begin with an assessment of whether the prosecutor's actions amounted to misconduct. If they did not, then defense counsel's failure to object cannot be characterized as falling below the standard of reasonableness in the provision of legal representation.

14

### 2.1  *"Vouching" for Credibility of Prosecution Witness*

Defendants first assert the prosecutor engaged in misconduct because her assertion, during her rebuttal closing argument, that Causey "was very, very credible," amounted to improperly "vouching" for a witness.  We disagree.

"[I]t is misconduct for prosecutors to vouch for the strength of their case by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." (*People v. Huggins* (2006) 38 Cal.4th 175, 206–207.)  Similarly, it is misconduct "'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' [Citiation.] The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.'" (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)

It is also improper for prosecutor to argue credibility based on his or her experience in that role:  *People v. Padilla* (1995) 11 Cal.4th 891, 957, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, foot 1, [court assumed impropriety of remark that defendant's story was "'one of the more transparently made-up stories I have ever heard as a DA'"]; *People v. Medina* (1995) 11 Cal.4th 694, 758 [prosecutor conceded impropriety of comment that "'no case I have ever seen' had such overwhelming evidence"].)

However, these limits do not wholly preclude a prosecutor from commenting on a witness's credibility.  "'"[A] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom."'" (*People v. Ward* (2005) 36 Cal.4th 186, 215.)  "[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized

15

as improper vouching." (*People v. Frye* (1998)18 Cal.4th 894, 971, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In this case, the prosecutor's statement that Causey "was very, very credible" reflects, on its face, that the prosecutor was addressing the content of Causey's testimony, rather than vouching for his *character* in the abstract. A person doing the latter would say Causey "*is* very credible." Employing the past tense demonstrates the prosecutor was referring not to Causey himself, but to the testimony he had offered at trial: it *was* credible.

Moreover, as the prosecutor went on to demonstrate in the course of her rebuttal, her assertion of Causey's credibility was based on an evaluation of the evidence in the record, rather than any implied endorsement of his character or knowledge of facts outside the record. After arguing it would be inappropriate for the jurors to disregard Causey's testimony simply because he had an admitted drug addiction, she discussed why he would have little motive to participate in a break in of his mother's closets, why he would have known there was little to gain from doing so, and why his imprisonment in the shower and closet made no sense if he were an active participant in the robbery, as defendants had argued. And she then questioned why Causey would have even admitted to his own participation in the drug use if he had decided to otherwise lie about what occurred during the weekend. In short, her argument centered on what inferences the jurors should draw about Causey's credibility, based upon the evidence in the record.

*People v. Anderson* (1990) 52 Cal.3d 453, is similar. In that case, the defendant complained that the prosecutor had improperly vouched for the credibility of the police officers who testified at trial when she asserted that "'[a] law enforcement officer is no good as a witness if his credibility is in doubt,' and in essence supported the credibility of the officers testifying in this case by noting that 'a number of them . . . are old, experienced officers. They've got 15, 20, 22 years of experience on the force.' The

16

prosecutor expressed her doubt that any of them would 'jeopardize' his reputation by lying on the witness stand 'just to convict one defendant.' The prosecutor continued by noting that defendant, on the other hand, would only be testifying once, rather than a number of times, that he 'doesn't have anything else to lose,' and 'so what if you do catch him in a few lies?'" (*Id.* at pp. 478.) The Supreme Court concluded the remarks were not improper, because "the prosecutor limited her remarks to *facts of record*, namely, the years of experience of the officers involved, and her 'vouching' was clearly based on inferences reasonably drawn therefrom, rather than on her personal belief or knowledge. [Citation.] We find no improper prosecutorial vouching here." (*Id.* at p.479.) We reach the same conclusion in this case.

But even if we had doubts about the propriety of the prosecutor's statement, defendants' claim of ineffective assistance, based on their counsels' failure to object to it, is ultimately unpersuasive. In order to prevail on such a claim, the defendant would also have to show that, as a result of counsel's ineffective assistance, he "'suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.'" (*People v. Gamache, supra*, 48 Cal.4th at p. 391.) But in this case, the jurors were told, clearly and repeatedly, that they alone must evaluate Causey's credibility and that nothing the prosecutor said could be treated as evidence in making that assessment. We presume the jurors followed those instructions (see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83), and defendants have offered no argument to undermine that presumption. We consequently reject defendants' claim that their counsels' failure to object when the prosecutor argued that Causey was credible in her closing argument had a prejudicial effect on the outcome.

*2.2 Suggesting Defendants Were Withholding Evidence From Jury*

Defendants also contend the prosecutor committed misconduct when she informed the jury that "[i]f it was up to the prosecution," they would have the transcript of a recorded interview to take with them into the jury room during deliberations. According to defendants, the prosecutor's comment implied that defendants were withholding evidence from the jury. The record, however, does not support that assertion.

The prosecutor's reference was to the transcript of a 90-minute interview of Timatyos that had been conducted by police at a Starbucks coffee house. The audio recording of that interview was played during the trial, and the trial court passed out copies of the transcript for the jurors to review while listening. The court explained to the jurors that it was doing so because a California court rule required that "[w]henever the lawyers want to play a tape to the jury . . . the jury shall be given a transcript."

The court emphasized, however, that the transcript was merely "a tool of convenience. So that while you are hearing the statements of the interview, you can read along the transcript to see what these people are saying." The court then cautioned "the transcript may not be completely accurate" and "the real evidence is the disk itself." The court also told the jurors that if they wanted to review any part of the recorded statement during deliberations, they would be provided a copy of the disk for that purpose, but the transcript copies they were using while listening to the recording during trial would be retrieved after the recording finished, "because that's not really the evidence."

After all parties had concluded their presentations of evidence, the court informed the jury "[y]ou have heard all the evidence you will hear in this case" and then asked the jurors if they had any questions. One juror asked if transcripts would be available in the jury room. The court responded, "[i]f you are referring to the transcript of Simone Timatyos, I have to make a ruling as to whether that's admissible or not. I will do that this afternoon."

18

Then, after the jury was excused, defendants objected to providing the jurors with the transcript of Timatyos' interview for use during deliberations, pointing out that just as the court had explained to the jurors, only the recording itself – and not the transcript – qualified as "evidence." In response, the court noted that while the transcripts of recorded statements are generally allowed into the jury room, that was because the parties generally agree to it. However, if defendants were objecting, the transcript would have to be disallowed in this case. The jury, however, was not privy to this exchange.

Based on those facts, it would be unreasonable to conclude the prosecutor's expression of disappointment that jurors would not have a copy of the transcript of Timatyos' interview in the jury room was intended to imply defendants were "withholding evidence." Most significant is the fact that by the time the prosecutor made her closing argument, the jurors already knew *the content of the transcript*, which they had been allowed to review while listening to the recorded interview during trial. Thus, the prosecutor knew the jurors *would not be wondering* what information the prohibited transcript might have revealed, nor would they be suspicious about why unknown information was being kept from them. They had already seen it. Further, the prosecutor knew the jurors had already been told by the court that (1) the transcript was not evidence, (2) it might not be completely accurate, and (3) only the actual recording – which they would have access to in the jury room – qualified as evidence of what had been said during the interview. Thus, the prosecutor was not suggesting – nor could jurors have reasonably inferred – that *evidence* was being withheld from them. And finally, the prosecutor also knew the court had already informed the jurors that it was the court itself – not the parties – that would decide whether the transcript would be admitted into the jury room. And the jury had no way of knowing that the court's decision to exclude the transcript from the jury room had been based solely on defendants' objection.

19

Thus, the prosecutor's lament cannot reasonably be understood to have pointed the finger *at defendants*.

But even if that inference were otherwise plausible in the abstract, it would have been dispelled when the prosecutor immediately made clear that her concern about the missing transcript was purely a practical one: she was worried it might be unduly difficult for jurors to focus on what she believed were the important parts of the 90-minute recorded interview, without a transcript to use as an aid in finding those parts. So the prosecutor promised the jury she would devote time during the lunch hour to identifying the important parts and identifying where they could be found on the recording. Then after the lunch break she did that, telling the jury that "as far as [Timatyos's] interview at Starbucks, because you are not going to have the transcript anymore . . . I'm going to try to save you time and point a couple of spots out and the approximate time that it is said, if you want to ho[m]e in on those areas."

Because there is no reasonable likelihood that the prosecutor could have intended her lament about the lack of a transcript in the jury room as a suggestion defendants were responsible for withholding evidence – and there is also no reasonable possibility the jury would have drawn such an inference from it – we reject defendants' claim of prosecutorial misconduct on the basis of that statement.

And again, our determination that the prosecutor's statement did not constitute misconduct means, as a matter of law, that defendants' counsel did not provide ineffective assistance when they neglected to object at the time the prosecutor made it.

DISPOSITION

The case is remanded to the trial court with directions to prepare amended sentencing abstracts reflecting that the terms imposed on both defendants for false

20

imprisonment are stayed pursuant to section 654 and forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.


                              RYLAARSDAM, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.